DAVID T. PROSSER, J.
¶ 1. This is a review of an unpublished decision of the court of appeals, State v. Subdiaz-Osorio, No. 2010AP3016-CR, unpublished slip op. (Wis. Ct. App. Nov. 15, 2012).
¶ 2. The case involves the increasingly busy intersection between Fourth Amendment privacy considerations and the constant advancement of electronic technology. The court must determine whether law enforcement officers may contact a homicide suspect's cell phone provider to obtain the suspect's cell phone location information without first securing a court order based on probable cause. The court also must consider whether the suspect effectively invoked his right to counsel during an interrogation when he asked how he could get an attorney rather than affirmatively requesting the presence of counsel.
¶ 3. The homicide here occurred in Kenosha, Wisconsin. After fatally stabbing his brother, Nicolas Subdiaz-Osorio (Subdiaz-Osorio)[1] borrowed his girlfriend's car and fled the scene of the crime. Kenosha police quickly suspected that Subdiaz-Osorio, who was *47 in the country illegally, was heading for Mexico and carrying the murder weapon. They marshalled their information and, acting through the Wisconsin Department of Justice, asked Subdiaz-Osorio's cell phone provider to track his cell phone location. The tracking was successful, and Subdiaz-Osorio was arrested on a highway in Arkansas as he headed south. Several Kenosha officers promptly went to Arkansas to interrogate the suspect. Subdiaz-Osorio was questioned in Spanish and given his rights in Spanish. After the officers explained the extradition process, Subdiaz-Osorio asked how he could get an attorney because he could not afford one. The officers told him that Arkansas would provide him an attorney if he needed one but then continued to question him. Subdiaz-Osorio later moved to suppress all evidence obtained after his arrest on grounds that the search of his cell phone's location information violated his Fourth Amendment rights and that he was denied his Fifth Amendment right to counsel. He also alleged violations of his rights under the Wisconsin Constitution.
¶ 4. The Kenosha County Circuit Court, Mary K. Wagner, Judge, denied Subdiaz-Osorio's motions to suppress the evidence obtained after his arrest in Arkansas, accepted his plea to an amended charge, and entered a judgment of conviction for first-degree reckless homicide. The court of appeals affirmed, determining that any error by the circuit court was harmless because it was beyond a reasonable doubt that Subdiaz-Osorio would have entered the same plea even if the evidence obtained after his arrest had been suppressed.
¶ 5. This case presents two issues for review. First, did law enforcement agents violate Subdiaz-Osorio's Fourth Amendment rights when they procured his cell phone location information without first obtain *48 ing a court order[2] based on probable cause? Second, did Kenosha police officers violate Subdiaz-Osorio's Fifth Amendment right to counsel when they continued to interview him after he asked how he could get an attorney?
¶ 6. The court is deeply divided on these issues as evidenced by the number of separate writings.
¶ 7. This opinion is the lead opinion. It will outline the legal conclusions of the writer, including a mandate that the decision of the court of appeals is affirmed. Justice Ann Walsh Bradley, Justice N. Patrick Crooks, Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael J. Gableman concur solely in the mandate.
¶ 8. The following conclusions are my conclusions.
¶ 9. First, I assume for this case, without deciding the issue, that people have a reasonable expectation of privacy in their cell phone location data and that when police track a cell phone's location, they are conducting a search under the Fourth Amendment. I make these assumptions to avoid delivering a broad pronouncement about reasonable expectations of privacy in the rapidly developing field of wireless technology.[3]
*49 ¶ 10. Second, even though I assume there was a search in this case and recognize that police did not have a court order when they tracked Subdiaz-Osorio's cell phone location, I conclude that police did have probable cause for a warrant and that the exigent circumstances of this case created an exception to the warrant requirement.[4]
¶ 11. Third, I conclude that Subdiaz-Osorio failed to unequivocally invoke his Fifth Amendment right to counsel when he said, "How can I do to get an attorney here because I don't have enough to afford for one." Subdiaz-Osorio asked how he could get an attorney, which could lead a reasonable officer to wonder whether Subdiaz-Osorio was affirmatively asking for counsel to be present during the custodial interrogation or simply inquiring about the procedure for how to obtain an attorney. See State v. Jennings, 2002 WI 44, ¶¶ 27-33, 252 Wis. 2d 228, 647 N.W.2d 142. Moreover, Subdiaz-Osorio asked how he could get an attorney immediately after a discussion about the extradition process. The context is important, and the interviewing officers could reasonably believe that Subdiaz-Osorio was asking how to get an attorney for his extradition hearing rather than asking for counsel to be present at the interrogation. Therefore, the interviewing officers did not violate Subdiaz-Osorio's Fifth Amendment rights when they continued to question him after he asked about how he could get an attorney.[5]
*50 I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
¶ 12. In February 2009 Subdiaz-Osorio lived at a trailer park in Kenosha with his brother, Marco Antonio Ojeda-Rodriguez (Ojeda-Rodriguez). Two other men, Liborio DeLaCruz-Martinez (Liborio) and Damien DeLaCruz-Martinez (Damien), lived with the brothers.
¶ 13. Subdiaz-Osorio was 27 years old and had been living in Kenosha for about two years. The week before the homicide, Subdiaz-Osorio and OjedaRodriguez had argued because their employer had laid off Ojeda-Rodriguez but allowed Subdiaz-Osorio to keep his job. Rankled by Ojeda-Rodriguez's bitterness, Subdiaz-Osorio threatened to stab Ojeda-Rodriguez. Liborio reported that while they were eating in the kitchen, Subdiaz-Osorio held up a steak knife and said that if Ojeda-Rodriguez kept bothering him about being laid off, Subdiaz-Osorio would stab him.
¶ 14. The bad blood culminated in the late evening and early morning hours of Saturday, February 7 and Sunday, February 8, 2009.[6] Late on February 7, Subdiaz-Osorio and Roberto Gonzales-Carreno (Roberto) had a few beers and called Lanita Mintz (Lanita) to come and dance for them. Lanita knew Subdiaz-Osorio and Ojeda-Rodriguez because the three of them had worked together for approximately four months. Subdiaz-Osorio and Roberto picked up Lanita and brought her to the trailer around 10:45 p.m. The three of them went to Subdiaz-Osorio's bedroom, and Lanita changed into lingerie. Roberto left around 11:20 p.m. At some point after that, Ojeda-Rodriguez tried to force his *51 way into Subdiaz-Osorio's bedroom while Subdiaz-Osorio tried to keep him out. Ojeda-Rodriguez, a former hoxer, was heavier than Suhdiaz-Osorio and was able to gain entry into the bedroom.
¶ 15. When Ojeda-Rodriguez entered, he and Subdiaz-Osorio began arguing in Spanish. Lanita could tell that both Subdiaz-Osorio and Ojeda-Rodriguez had been drinking, but because she speaks little Spanish, she could not understand what they said. The argument lasted less than two minutes and ended with OjedaRodriguez punching Subdiaz-Osorio in the face. Subdiaz-Osorio fell into his dresser, then got up to retrieve two knives from his closet. Lanita later testified that Subdiaz-Osorio had a knife in each hand and that he stabbed Ojeda-Rodriguez in the chest after Ojeda-Rodriguez said something aggressive in Spanish and pounded on his chest. As Ojeda-Rodriguez continued to pound his chest, Subdiaz-Osorio lifted one of the knives and brought it down toward Ojeda-Rodriguez's face, cutting him just under the left eye. The blade pierced Ojeda-Rodriguez's left eye socket and entered the right hemisphere of his brain. Ojeda-Rodriguez fell back into the wall, and Subdiaz-Osorio began kicking him in the face and punching him between kicks. When he stopped beating Ojeda-Rodriguez, Subdiaz-Osorio turned to Lanita and asked her to push one of his teeth back into place because it had probably been dislodged when Ojeda-Rodriguez hit him. Lanita refused, and Subdiaz-Osorio turned back to Ojeda-Rodriguez and punched him two more times. Lanita pushed Subdiaz-Osorio off of Ojeda-Rodriguez and into the doorway.
¶ 16. After Subdiaz-Osorio left the room, Liborio and Damien arrived and entered the bedroom. Lanita said that Liborio and either Damien or Subdiaz-Osorio carried Ojeda-Rodriguez to Ojeda-Rodriguez's bedroom. *52 As Lanita remembers it, Ojeda-Rodriguez was moving and speaking when she left, but she did not talk with him. She knew Ojeda-Rodriguez was hurt, but she did not think that his wounds were fatal. Lanita arrived home at 1:05 a.m. on February 8. She was the only eyewitness to the stabbing. Although Lanita could recall the event itself, she could not recall what happened to Subdiaz-Osorio's two knives.
¶ 17. After the stabbing, Subdiaz-Osorio asked Liborio for help bandaging Ojeda-Rodriguez, but when Liborio suggested that they call the police, Subdiaz-Osorio refused and said that he did not want to be arrested. Subdiaz-Osorio then asked his girlfriend, Estella Carreno-Lugo (Estella), to help him take care of Ojeda-Rodriguez. Estella came to Subdiaz-Osorio's trailer and helped bandage Ojeda-Rodriguez's wounds and clean him up. She and Subdiaz-Osorio then left the trailer for her home. Despite Estella's efforts, Liborio found Ojeda-Rodriguez dead the next morning. At 9:27 a.m. on February 8, Liborio, Damien, and Norma Romero (Norma) reported to the front counter of the Kenosha Safety Building that there had been a stabbing.
¶ 18. The police found Ojeda-Rodriguez's body battered and stabbed with "purple swelling" on his face and eyes and bandages on his left cheek and shoulder. Emergency Medical Services personnel confirmed that Ojeda-Rodriguez was dead. The medical examiner noted that there was a fatal stab wound under OjedaRodriguez's left eye and two stab wounds on OjedaRodriguez's left shoulder. The fatal stab occurred when Subdiaz-Osorio thrust the knife into Ojeda-Rodriguez's left eye, causing the blade to penetrate OjedaRodriguez's brain three to four inches.
*53 ¶ 19. Detective David May (Detective May) and Detective Gerald Kaiser (Detective Kaiser) became the lead detectives for the investigation. Detective May testified that he learned about the incident about 9:30 a.m. on Sunday, February 8. Several Spanish speaking officers interviewed the three individuals who came to the Safety Building. Officer Ernán DelaRosa arrived at 10:25 a.m. and interviewed Liborio, who said that Subdiaz-Osorio admitted that he had stabbed Ojeda-Rodriguez. Officer Gloria Gonzales arrived at 11:55 a.m. and interviewed Norma. Officer Arturo Gonzalez arrived at 12:06 p.m. and interviewed Damien.
¶ 20. Officer Pablo Torres[7] (Officer Torres) spoke with Estella around 10 a.m. at her home, and she told him that Subdiaz-Osorio came to her trailer asking for help because he had stabbed Ojeda-Rodriguez. Estella gave Subdiaz-Osorio's name to Officer Torres and told him that she allowed Subdiaz-Osorio to borrow her silver Saturn station wagon when he asked for it. She also gave Officer Torres Subdiaz-Osorio's cell phone number and the license plate number of her car. Police determined that Subdiaz-Osorio had family living in two communities in nearby Lake County, Illinois, but witnesses also informed the police that Subdiaz-Osorio was in the country illegally, and Estella thought that it was possible that Subdiaz-Osorio was on his way to Mexico, where he also had family. Officer Torres continued to interview Estella back at the police station until about 12 p.m. Following up on the information from Estella, the police contacted Subdiaz-Osorio's family in Illinois and determined that they had not heard from him. Officer Torres believed that since Subdiaz- *54 Osorio's family in Illinois did not know where he was, it was likely he was on his way to Mexico.
¶ 21. After compiling essential information from the witnesses, the Kenosha police put a temporary want[8] on Subdiaz-Osorio into the Crime Information Bureau (CIB)[9] and National Crime Information Center (NCIC).[10] CIB is a state system and NCIC is a national *55 system. The systems work together by sharing information. To enter information into the CIB and NCIC, the police had to demonstrate probable cause. The Kenosha police had probable cause to believe Subdiaz-Osorio committed the homicide based on their investigation, and they entered Subdiaz-Osorio's information into the systems. Together, the CIB and NCIC notified all law enforcement agencies in the country about the temporary want for Subdiaz-Osorio.
¶ 22. The notification of a temporary want was old technology. Kenosha police also wanted to track Subdiaz-Osorio's cell phone location to find the vehicle in which he was travelling. Sometime after 12 p.m., having heard nothing from CIB and NCIC, they contacted the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), and asked DCI to seek information from Sprint Nextel (Sprint), Subdiaz-Osorio's cell phone provider. DCI filled out and submit *56 ted a "Mandatory Information for Exigent Circumstances Requests" form to Sprint. The description on the form said, "Local law enforcement homicide suspect. Believed that suspect will flee the state or the country to avoid prosecution. Suspect has no ties to Wisconsin. Suspect considered armed and dangerous. Suspect poses a threat to the public." DCI requested Subdiaz-Osorio's subscriber information, his call records with cell site information within the past week, his precision location (GPS location), and his real-time Pen Register, Trap & Trace.[11]
¶ 23. Subdiaz-Osorio's Sprint Nextel Privacy Policy (Policy) contains a "Disclosure of Personal Information" section that reads:
We disclose personal information when we believe release is appropriate to comply with the law (e.g., legal process, E911 information)... or if we reasonably believe that an emergency involving immediate danger of death or serious physical injury to any person re *57 quires disclosure of communications or justifies disclosure of records without delay.
"[Pjersonal information" is "information that is directly associated with a person such as his or her name, address, telephone number, e-mail address, activities and preferences." The Policy also refers to Customer Proprietary Network Information (CPNI), which is "information Sprint Nextel obtains or creates when it provides wireline or mobile wireless telecommunications services to a customer." Under the Policy, location information is CPNI and is protected as described in the above block quotation. The Policy informs the subscriber that the "network knows the general location of your phone or wireless device whenever it is turned on." It goes on to say in a section titled "Presence, Location and Tracking Information" that in the event of an emergency, "The law also permits us to disclose the call location of a device on our network without a user's consent. . . ."
¶ 24. In addition to pursuing the cell phone location information, the police applied for a search warrant to search Subdiaz-Osorio's trailer. Detective Kaiser later stated that it usually takes between two and three hours to draft a search warrant and have it signed by a judge. This case was no different. Kenosha County Circuit Judge Bruce Schroeder issued the search warrant for the trailer on February 8 at 2:37 p.m. Judge Schroeder happened to be in his car when he was called and was able to stop at the police station relatively quickly. After obtaining the warrant, the Kenosha police searched the trailer around 3 p.m. The police did not find any knives that could have been the murder weapon at the scene of the crime, and thus did not know whether Subdiaz-Osorio had the knives with him.
*58 ¶ 25. Sometime during the afternoon, DCI obtained tracking information for Subdiaz-Osorio's cell phone without obtaining a warrant. The only information that DCI received from the cell phone provider was location information, not conversations or other data. After obtaining Subdiaz-Osorio's location information, Detective Kaiser called Arkansas police to inform them that Subdiaz-Osorio was traveling South on 1-55 and that the knives used in the murder were never recovered. Detective Kaiser gave the license plate information, the make, and the model of the car to an Arkansas patrol officer around 5:43 p.m. The Arkansas patrol officer pulled the car over in Luxora, Arkansas around 6:11 p.m. and took Subdiaz-Osorio and Roberto, who was driving the car, into custody. On the Sunday night he was arrested, Subdiaz-Osorio signed a consent form allowing police to obtain trace evidence from him, including DNA and fingernail clippings. The Arkansas police did not interrogate him that evening.
¶ 26. On Monday, February 9, Detective Kaiser traveled to Arkansas with Detective May and Officer Torres. The Arkansas police obtained a search warrant for the car at 2:34 p.m., and Detective Kaiser processed the car for evidence.
¶ 27. Officer Torres and Detective May interviewed Subdiaz-Osorio in the Mississippi County Jail in Luxora. The room was well-lit and roughly eight feet by eight feet in size with a table separating the suspect from the two officers. When Officer Torres entered the interrogation room, he removed Subdiaz-Osorio's handcuffs, and Subdiaz-Osorio accepted a Coke at the beginning of the interview. Subdiaz-Osorio told the police that he preferred that the interview be in Spanish, so that Officer Torres provided translation assistance. Officer Torres believed that Subdiaz-Osorio understood *59 him "very well," and Subdiaz-Osorio never said that he was having trouble comprehending Officer Torres's Spanish. Before speaking with Subdiaz-Osorio, Officer Torres informed Subdiaz-Osorio of his constitutional rights (Miranda[12] warning), and Subdiaz-Osorio signed a waiver form titled "Waiver of Constitutional Rights." Officer Torres read the form written in Spanish, Subdiaz-Osorio read the form himself, and Subdiaz-Osorio signed the form in Officer Torres's presence on February 9 at 3:34 p.m.
¶ 28. The officers made an audiovisual recording of the interview, portions of which were later played in court and translated contemporaneously from Spanish into English. During the interview, Subdiaz-Osorio asked if Officer Torres would be taking him back to Kenosha, and Officer Torres replied that he and Detective May would not be taking Subdiaz-Osorio back. Officer Torres explained the extradition process:
We aren't going to take you back to Kenosha. What happens is that you have to appear in front of a judge .... And after you appear in front of a judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha,... but we are not going to do that right now. We are not going to know that right now....
Immediately after Officer Torres explained how extradition would work in the above quotation, Subdiaz-Osorio asked, "How can I do to get an attorney here because I don't have enough to afford for one." Officer Torres responded, "If you need an attorney... by the time you're going to appear in the court, the state of Arkansas will get an attorney for you . . . ." Then their interview continued. Subdiaz-Osorio was very coopera *60 tive throughout the interview, which lasted less than an hour. Although he was cooperative, he did at one point contradict Lanita's version of the stabbing when he claimed that Ojeda-Rodriguez brought a knife into the bedroom and that he disarmed Ojeda-Rodriguez. After the interview, Officer Torres read a form titled "Consent to Search and Seizure," and Subdiaz-Osorio agreed to give up DNA and trace evidence when he signed the form at 4:12 p.m.
¶ 29. At no point in the interview in Arkansas did Officer Torres or Detective May threaten, coerce, or make any promises to Subdiaz-Osorio to get him to sign the Waiver of Constitutional Rights or the consent to obtain DNA and trace evidence.
¶ 30. On February 9, after the police had collected a substantial amount of evidence against him, Subdiaz-Osorio was charged with first-degree intentional homicide contrary to Wis. Stat. §§ 940.01(l)(a) (2009-10),[13] 939.50(3)(a), and 939.63(l)(b).
¶ 31. Officer Torres and Detective May interviewed Subdiaz-Osorio again on February 22, this time at the Kenosha Police Department, after Subdiaz-Osorio's return to Wisconsin. Again, the officers read Subdiaz-Osorio the Waiver of Rights form, and Subdiaz-Osorio consented and signed it. Subdiaz-Osorio also signed a "Consent to Search" form that allowed the Kenosha police to search his trailer. The Kenosha police applied for and obtained another search warrant for the trailer, but they did not need the warrant because they had Subdiaz-Osorio's consent. On February 22 Subdiaz-Osorio accompanied Detective May, Officer Torres, and other Kenosha police personnel to the scene of the *61 stabbing, and Subdiaz-Osorio walked through and assisted the officers in the investigation. Subdiaz-Osorio described the incident and again claimed that OjedaRodriguez had brought a knife into the bedroom. The officers told Subdiaz-Osorio that his story conflicted with Lanita's account, and Subdiaz-Osorio then admitted that he had procured the knives.
¶ 32. On April 1, 2009, Subdiaz-Osorio filed a pretrial motion to suppress all statements and evidence that the police obtained after his arrest.[14] In the suppression motion, Subdiaz-Osorio argued that the warrantless search of his cell phone's location data violated his Fourth Amendment rights, and therefore all evidence obtained after the arrest should be suppressed. Subdiaz-Osorio also filed a motion challenging the sufficiency of the criminal complaint and the bindover, and he moved to dismiss the information.[15] On May 14, 2009, Subdiaz-Osorio filed a separate motion to suppress the statements he made during the interrogation in Arkansas, on grounds that Officer Torres failed to properly inform Subdiaz-Osorio of his Miranda rights.
¶ 33. On June 26, 2009, Judge Wagner denied Subdiaz-Osorio's motion to suppress statements based on the alleged Fourth Amendment violation. Judge Wagner cited United States v. Forest, 355 F.3d 942 (6th Cir. 2004), vacated sub nom. on other grounds, Garner v. *62 United States, 543 U.S. 1100 (2005), for the proposition that tracking a phone on a public roadway is not a violation of the Fourth Amendment because there is no legitimate expectation of privacy on public roadways. Alternatively, the court determined that there were exigent circumstances because an alleged murderer was fleeing and was unpredictable. The court also denied the motion challenging the sufficiency of the complaint and bindover and refused to dismiss the case. Finally, the circuit court concluded that Officer Torres did not fail to properly inform Subdiaz-Osorio or honor his Miranda rights: Subdiaz-Osorio's question about an attorney was not a request to have an attorney with him during the interview; rather, Subdiaz-Osorio was asking about how he could obtain an attorney for the extradition hearing.
¶ 34. Therefore, Judge Wagner denied all motions to suppress evidence. The State filed an amended information on February 15, 2010, charging Subdiaz-Osorio with first-degree reckless homicide by use of a dangerous weapon contrary to Wis. Stat. §§ 940.02(1) and 939.63(l)(b), and Subdiaz-Osorio pled guilty to the charge in the amended information. The circuit court accepted the plea and found Subdiaz-Osorio guilty of first-degree reckless homicide by use of a dangerous weapon. On June 28, 2010, the circuit court sentenced Subdiaz-Osorio to 20 years of confinement and 15 years of extended supervision.
¶ 35. Subdiaz-Osorio appealed the judgment of conviction and the denial of his suppression motion under Wis. Stat. § 971.31(10).[16] State v. Subdiaz- *63 Osorio, No. 2010AP3016-CR, unpublished slip op., ¶ 2 (Wis. Ct. App. Nov. 15, 2012). The court of appeals assumed without deciding that the circuit court should have granted the suppression motion. Id., ¶ 3. However, the court determined that any error by the circuit court was harmless because it was beyond a reasonable doubt that Subdiaz-Osorio would have accepted the same plea absent the error. Id., ¶ 12. The court of appeals rejected Subdiaz-Osorio's argument that he could have pursued a self-defense theory if the evidence would have been suppressed inasmuch as Subdiaz-Osorio continued to assault Ojeda-Rodriguez after stabbing him and did not seek medical help. Id., ¶ 5.
¶ 36. The court also rejected the argument that without evidence that he fled to Arkansas, Subdiaz-Osorio could have shown that he did not act with utter disregard for life (a required element of first-degree reckless homicide). Id., ¶¶ 6, 9. According to the court of appeals, Subdiaz-Osorio's flight from Wisconsin and his false statement to the police about Ojeda-Rodriguez bringing one or more knives into his room were not especially important evidence in proving that Subdiaz-Osorio was acting with utter disregard; thus, the failure to suppress that evidence did not significantly impact the State's ability to prove that Subdiaz-Osorio acted with utter disregard. Id., ¶¶ 9-11. Finally, the court of appeals noted that the State had a strong eyewitness account of the murder, and Subdiaz-Osorio received a significant benefit in pleading to first-degree reckless homicide. Id., ¶ 12. Therefore, the court of appeals concluded that any error by the circuit court was harmless beyond a reasonable doubt and affirmed the judgment of conviction. Id.
¶ 37. Subdiaz-Osorio petitioned this court for review, which we granted on March 13, 2013.
*64 II. STANDARD OF REVIEW
¶ 38. Whether law enforcement agents have violated a suspect's Fourth or Fifth Amendment rights is a question of constitutional fact. State v. Phillips, 218 Wis. 2d 180, 189-91, 577 N.W.2d 794 (1998); see State v. Brereton, 2013 WI 17, ¶ 17, 345 Wis. 2d 563, 826 N.W.2d 369; State v. Sveum, 2010 WI 92, ¶ 16, 328 Wis. 2d 369, 787 N.W.2d 317. Although the court upholds findings of historical fact unless they are clearly erroneous, constitutional questions are questions of law that this court reviews independently. Brereton, 345 Wis. 2d 563, ¶ 17; Phillips, 218 Wis. 2d at 189-91. In addition, the court applies a de novo standard of review to "determine whether the historical or evidentiary facts establish exigent circumstances" to justify a warrantless search. State v. Richter, 2000 WI 58, ¶ 26, 235 Wis. 2d 524, 612 N.W.2d 29 (citation omitted).
III. DISCUSSION
A. The Current Privacy Landscape
¶ 39. This case involves a brutal killing, but the law enforcement effort to apprehend the killer has implications for citizens at large. Thus, I begin my analysis with a general discussion of privacy and citizens' concerns about protecting personal information in an era when technology is chipping away at traditional notions of privacy.
¶ 40. Privacy is a pillar of freedom. There is great value in being able to enter and withdraw from public spaces and disclose the details of our thoughts and movements at our discretion. We share pieces of our *65 selves with loved ones and bond over the secrets of our identities. We perfect ideas behind closed doors and reveal them to the public when they are ready. We take comfort in seclusion from the world in moments of intimacy. Privacy is not insignificant; it is not something to be taken for granted; and even as it diminishes as our world becomes more interconnected and dangerous, privacy must not become a legal fiction.
¶ 41. It would be difficult to overstate the value of privacy:
Privacy is valuable because it is necessary for the proper development of the self, the establishment and control of personal identity, and the maintenance of individual dignity. Without privacy, it not only becomes harder to form valuable social relationships— relationships based on exclusivity, intimacy, and the sharing of personal information — -but also to maintain a variety of social roles and identities. Privacy deserves to be protected as a right because we need it in order to live rich, fulfilling lives, lives where we can simultaneously play the role of friend, colleague, parent and citizen without having the boundaries between these different and often conflicting identities breached without our consent.
Stephen E. Henderson, Expectations of Privacy in Social Media, 31 Miss. C. L. Rev. 227, 233 (2012) (quoting Benjamin Goold, Surveillance and the Political Value of Privacy, 1 Amsterdam L. Forum 3, 3-4 (2009)). Thus, privacy serves more than the individual; it is an integral component of a well-ordered society.
¶ 42. The privacy landscape is shifting as we embrace new technologies. Electronic devices afford us great convenience and efficiency, but unless our law keeps pace with our technology, we will pay for the benefit of our gadgets in the currency of privacy. As we *66 incorporate more of our lives into our smartphones and tablets, we are not merely using technology as a tool for societal and professional navigation; we are digitizing our identities. Thus, efforts to access the information in our electronic devices invade and expose the marrow of our individuality.
¶ 43. As Samuel Warren and Louis Brandéis noted presciently well over a century ago, "Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right 'to be let alone.' "[17] Perhaps in this age of technology, that right is not as strong as it once was, but it should be our goal to quell its attenuation insofar as it is safe and reasonable to do so. It used to be that "the greatest protections of privacy were neither constitutional nor statutory, but practical." United States v. Jones, 565 U.S. _, 132 S. Ct. 945, 963 (2012) (Alito, J., concurring). Today, in an environment of rapid technological advancement that allows tracking via electronic data, practical limitations on surveillance are quickly dissipating. Technology, it seems, has been irreversibly incorporated into our modern lives. The question we face is whether privacy must be eviscerated to accommodate innovation.
¶ 44. I believe there is room in the law for both, as well as security. Technology brings with it the danger of criminal opportunism. Thus, at times privacy must make room for security, for privacy is worth little if it is overshadowed by fear. There will be times at which privacy must yield to security in order to thwart crimes, from identity theft to terrorism. The Fourth Amend *67 ment often conjures the image of a scale on which we balance the needs of law enforcement and the rights of individuals. Technological innovation does not change the need for balance, but it makes the act of balancing difficult. It is no small task to afford law enforcement officers and government agencies the leeway they need to keep citizens safe while ensuring that citizens retain a reasonable degree of privacy.
¶ 45. The balancing is especially important as citizens pay close attention to their privacy rights in the context of wireless technology. As awareness of our dwindling privacy increases, surveys consistently reveal that people are apprehensive about losing privacy with regard to their personal information.[18] As cell site location and GPS technology become ubiquitous,[19] *68 Americans are adding cell phone location information to the list of concerns.[20] This concern makes sense as an estimated 335.65 million wireless subscriber connections existed in the United States at the end of 2013.[21] The court is mindful of the pervasiveness of wireless technology and of our citizens' concern for their privacy as we analyze the constitutional protections against unreasonable government intrusions.
B. Constitutional Protections of Privacy
¶ 46. The Fourth Amendment of the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreason *69 able searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV[22] In the event of a Fourth Amendment violation, the usual remedy is suppression of evidence obtained in the search. State v. Ferguson, 2009 WI 50, ¶ 21, 317 Wis. 2d 586, 767 N.W.2d 187. However, there are several exceptions to the warrant requirement. See State v. Krajewski, 2002 WI 97, ¶ 24, 255 Wis. 2d 98, 648 N.W.2d 385 (noting that exceptions to the warrant requirement include consent and exigent circumstances). Particularly relevant to this case is the exception for exigent circumstances, which this opinion discusses below.
C. Judicial Interpretations of Constitutional Protections of Privacy
¶ 47. This case requires the court to consider whether the tracking of Subdiaz-Osorio's cell phone location was a search under the above-quoted constitu *70 tional provisions and, if so, whether it required a warrant or was subject to one of the well-delineated exceptions to the warrant requirement. My analysis keeps in mind Justice Kennedy's caution that: "The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010) (citing Olmstead, v. United States, 277 U.S. 438 (1928), overruled by Katz v. United States, 389 U.S. 347 (1967)).[23]
1. Trespassory Searches
¶ 48. Recent decisions from both the United States Supreme Court and this court have utilized the common law trespass theory to analyze whether a search violated the Fourth Amendment. Case law interpreting the Fourth Amendment "was tied to common-law trespass, at least until the latter half of the 20th century." Jones, 132 S. Ct. at 949 (citations omitted). Recently, the Court has turned again to trespass theory, deciding in Jones that government installation of a GPS tracking device under a suspect's Jeep without a valid warrant was a search because the placement of the device was an impermissible physical intrusion. Id. Trespass theory would not be applicable to the effort to *71 obtain cell phone location information unless one were to deem the cell phone provider's electronic interaction with Subdiaz-Osorio's cell phone as a physical trespass. Such an analysis would be unnatural.[24]
¶ 49. This court has not had the opportunity to analyze whether the tracking of cell phones in complete absence of a warrant implicates a suspect's Fourth Amendment rights, but the court has decided that valid warrants may permit GPS tracking of vehicles. See Brereton, 345 Wis. 2d 563, ¶ 3 (installation of GPS device did not go beyond scope of warrant); Sveum, 328 Wis. 2d 369, ¶ 74 (warrant for GPS tracking was valid and execution of warrant was reasonable). Although those prior cases involved tracking facilitated by technology, the present case falls under the category of a non-trespassory search and does not benefit from an analysis that relies on the trespass theory of Fourth Amendment searches.
¶ 50. This court's opinion in State v. Tate, 2014 WI 89, 357 Wis. 2d 172, 849 N.W.2d 798, discusses the requirements to obtain a warrant for cell phone location tracking.[25] Tate is similar to this case in that it does not involve a trespass. However, Tate focuses on whether the court order there was valid to authorize *72 tracking of the defendant's cell phone location, whereas this case involves an assumed non-trespassory search in the absence of a court order.
2. Non-Trespassory Searches
¶ 51. The Supreme Court expanded the traditional concept of a search in 1967 by extending Fourth Amendment protections to circumstances in which technology enabled an invasion of privacy without a trespass. See Katz, 389 U.S. at 360-61 (Harlan, J., concurring) (determining that regardless of trespass, the Fourth Amendment protects a person's "reasonable expectation of privacy"); see also Jones, 132 S. Ct. at 953 ("Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."). In Katz, the government used evidence of the defendant's incriminating phone conversations that the FBI secretly recorded with a device attached to the outside of a public phone booth.[26] Katz, 389 U.S. at 348. Because the defendant had a reasonable expectation of privacy in the phone booth, and because the government failed to get a warrant, the FBI's eavesdropping violated the defendant's Fourth Amendment rights. Id. at 353-59.
*73 ¶ 52. Justice Harlan's concurrence set forth a two-part test to determine when a non-trespassory search implicates the Fourth Amendment: (1) the person must have a subjective expectation of privacy; and (2) the expectation of privacy must be "one that society is prepared to recognize as 'reasonable.[1]" Id. at 361 (Harlan, J., concurring). As the Supreme Court suggested in Jones, Katz offers the proper test to determine whether cell phone location tracking receives Fourth Amendment protection. See Jones, 132 S. Ct. at 953.
3. The Cell Phone Policy and the Subjective Expectation of Privacy
¶ 53. The State contends that Subdiaz-Osorio did not have a reasonable expectation of privacy in his cell phone location data because his Sprint Policy said that Sprint would disclose location information to law enforcement in the event of an emergency. A recent federal case from Vermont offers an intriguing analysis of a suspect's subjective expectation of privacy based on his cell phone policy. United States v. Caraballo, 963 F. Supp. 2d 341 (D. Vt. 2013).
¶ 54. In Caraballo, the defendant carried out an execution-style murder when he bound up a woman, shot her in the back of the head, and left her body in the woods. Id. at 343. The victim had been arrested in the past and had told police that she was engaged in drug activity with a man named Frank Caraballo. Id. In her past discussions with police, the victim said that she was very afraid of Caraballo because he would kill her if he knew she was talking to the police, and he had many weapons. Id. Given what they knew about the defendant, the police decided that they would track his cell phone so that they could find and arrest him as quickly *74 as possible. Id. at 345-46. Because time was precious, they did not obtain a warrant. Id.
¶ 55. Caraballo argued that the warrantless search of his cell phone location data violated his Fourth Amendment rights. Id. at 342. The court went through a variety of analyses but determined that the defendant did not have a reasonable expectation of privacy in his cell phone location data because his Sprint privacy policy informed him that Sprint may disclose personal information in response to emergencies. Id. at 362-63. Hence, the court said, the defendant knew that the police could track him because the situation was an emergency. Id. at 363. Although the facts of Caraballo and the cell phone policy there are similar to the present case, I choose to decide this case on different grounds because total reliance on Subdiaz-Osorio's Policy to decide this case would be problematic.
¶ 56. First, the Policy in this case is confusing and difficult to interpret. It consists of nine pages that include piecemeal definitions and vague terminology. For example, the Policy creates confusion by defining the term "CPNI" at several different points with varying degrees of specificity.[27] The definition of CPNI is important because it includes location information, but *75 because the full definition is spread out over several pages, references to CPNI are difficult to understand.
¶ 57. The Policy is also unclear about what information Sprint will disclose in the event of an emergency. For example, in a paragraph titled "Protection of Sprint Nextel and Others,"[28] the Policy says that Sprint discloses personal information (of which CPNI is a "special category") if Sprint "reasonably believe[s] that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure of communications or justifies disclosure of records without delay." (Emphasis added.) The "communications" language suggests that Sprint will disclose only information related to communications — like phone calls — and there is no attempt to define the "records" that Sprint will disclose.
¶ 58. The Policy later says in a section titled "Presence, Location and Tracking Information" that "[Location information derived from providing our voice service, in addition to being covered by this Policy, is CPNI and is protected as described above." Thus, the full definition of CPNI does not come until after the section that discusses disclosure of CPNI. Moreover, it is difficult to see how the customer's CPNI is "protected as described above" as the paragraph above enumerates only circumstances in which information will be disclosed. The "Presence, Location and Tracking Information" section goes on to say that Sprint may disclose "call location" information, but the term "call location," like the phrase "disclosure of communications," misleadingly implies that only location data obtained from a phone call may be disclosed. It is possible that a *76 customer would read this Policy and understand that his cell phone may be tracked at all times, but that is not the only possible reading.
¶ 59. In sum, I am reluctant to say that a person loses his reasonable expectation of privacy based on an opaque contract. The Fourth Amendment is complicated enough without introducing contract interpretation into the calculus.
¶ 60. Second, even if the Policy clearly provided that Sprint may disclose location information to law enforcement in an emergency, that language merely governs the conduct of Sprint.[29] It does not necessarily follow that law enforcement may lawfully seek and obtain the information without a court order or without satisfying the exigent circumstances exception.[30] Thus, *77 a customer might still reasonably assume that the cell phone company will disclose information only when presented with a valid court order.
¶ 61. Third, although it is likely that all cell phone policies contain language similar to the Sprint Policy in this case, law enforcement may not know what any given individual's cell phone policy actually says. It is untenable to contend that a search under the Fourth Amendment depends on the specific language in an individual's cell phone policy — that law enforcement may track a cell phone without a warrant, understanding that if the policy does not alert the suspect that he may be tracked, the search will violate the Fourth Amendment.
¶ 62. Fourth, the language in Sprint's Policy mirrors the language in the exigent circumstance exception to the warrant requirement. One example of this exception requires law enforcement to show probable cause and a reasonable belief that there is "a threat to safety of a suspect or others." State v. Hughes, 2000 WI 24, ¶¶ 19, 25, 233 Wis. 2d 280, 607 N.W.2d 621. The Policy says that Sprint discloses information "if we reasonably believe that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure." Thus, both the exigent circumstances exception and the Policy contemplate the government obtaining location data where someone's safety is in jeopardy. However, the exigent circumstances exception contains the additional requirement of probable cause. I believe it is more appropriate to interpret the Policy as permitting the wireless services provider to disclose information in exigent circumstances rather than saying that the clause nullifies a customer's reasonable subjective expectation of privacy.
*78 ¶ 63. Fifth, interpreting the cell phone policy to eliminate a customer's reasonable subjective expectation of privacy invites law enforcement to be complacent in its requests for tracking. The Caraballo court noted that Sprint processes thousands of emergency requests each year, and it is Sprint's practice not to second-guess law enforcement's emergency requests. Caraballo, 963 F. Supp. 2d at 349. If law enforcement agents say that there is an emergency, wireless providers apparently give up the location information almost without exception. The deference to law enforcement's tracking requests is not inherently wrong, but requiring police to have probable cause and an exigent circumstance before requesting location data, if they do not have a warrant, diminishes the potential for abuse.
¶ 64. Finally, I believe it prudent to heed the cautionary advice of the Supreme Court when it comes to determining whether a policy can render an expectation of privacy unreasonable. See Quon, 560 U.S. at 759. In Quon, the Ontario Police Department (OPD) in California distributed to various officers pagers that could send and receive text messages. Id. at 750-51. OPD explicitly informed the officers that messages on the pagers were not private and that the officers should have no expectation of privacy when sending texts on the pagers. Id. at 758. When Police Sergeant Jeff Quon (Quon) challenged the OPD's decision to look at his sexually explicit text messages, claiming a Fourth Amendment violation, the Court decided not to determine whether Quon had a reasonable expectation of privacy in the texts. Id. at 752-53, 760 ("A broad holding concerning employees' privacy expectations vis-a-vis employer-provided technological equipment might have implications for future cases that cannot be predicted. It is preferable to dispose of this case on *79 narrower grounds."). The Court then assumed Quon had a reasonable expectation of privacy and decided that the special-needs-of-the-workplace exception applied to allow the warrantless search. Id. at 760-61. Because I can avoid a broad pronouncement regarding reasonable expectations of privacy by analyzing this case under the exigent circumstances exception, I need not decide whether Subdiaz-Osorio's cell phone Policy nullified his subjective reasonable expectation of privacy in his cell phone location information.
4. The Objective Reasonableness of the Expectation of Privacy in Cell Phone Location Information
¶ 65. Despite its apparent simplicity, the Katz test's second prong — whether society is prepared to recognize an expectation of privacy as reasonable — has been the subject of much confusion, debate, and analysis, and it is far from an easy touchstone to apply.[31] See, e.g., California v. Greenwood, 486 U.S. 35, 46-49 (1988) (Brennan, J., dissenting) (disagreeing with the majority about whether respondents had a reasonable expectation of privacy in their trash); Smith v. Maryland, 442 U.S. 735, 747 (1979) (Stewart, J., dissenting) (disagreeing with the majority and suggesting that people have a reasonable expectation of privacy in the phone numbers that they dial).
¶ 66. Although it is difficult to apply, the interpretation of what society is prepared to recognize as a "reasonable expectation of privacy" is an important part of the analysis under Katz. See Florida v. Riley, 488 U.S. *80 445, 451-52 (1989). In Riley, the Court considered whether police surveillance of a greenhouse from a helicopter 400 feet in the air was a search that required a warrant. Id. at 447-48. A plurality of the Court said that because anyone could have flown a helicopter and observed the top of the greenhouse without violating the law, it was not reasonable for the respondent to expect privacy when he left the top of the greenhouse partially open. Id. at 450-51. Justice O'Connor's concurrence tempered Riley's plurality by emphasizing that the search was not permissible simply because the helicopter complied with FAA regulations or because any citizen could have conducted the same search. Id. at 454-55 (O'Connor, J., concurring). Instead, Justice O'Connor suggested that "consistent with Katz, we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity" to determine if the search was "one that society is prepared to recognize as 'reasonable.'" Id. at 454 (quoting Katz, 389 U.S. at 361).
¶ 67. In accordance with Justice O'Connor's Riley concurrence, the Court later determined that it was presumptively unreasonable for the government to use technology that was not in general public use to conduct a warrantless search that would normally require a physical intrusion of the home subject to the search. Kyllo v. United States, 533 U.S. 27, 40 (2001). In Kyllo, the government's use of thermal imaging to determine whether the defendant's house contained high-intensity lamps used to grow marijuana constituted a search under the Fourth Amendment. Id. at 29, 40. The Court concluded that because the government used a thermal imaging device not in general public use to see details inside a house that would normally require a physical intrusion, the warrantless surveillance was an im *81 proper search. Id. at 40. Kyllo demonstrates that surveillance aided by technology can rise to the level of an impermissible search even absent a physical intrusion.
¶ 68. Because the concept of an objective reasonable expectation of privacy is elusive, this opinion makes no definitive pronouncement as to whether society is prepared to recognize as reasonable an expectation of privacy in cell phone location data. Given the widespread apprehension of government intrusion in citizens' electronic personal information, we cannot say that an expectation of privacy in cell phone location data is unreasonable even if it were true that the public is generally aware that cell phone tracking is possible. On the other hand, cell phone location tracking might be better understood and more prevalent than, say, thermal imaging. I need not decide the issue of an objective reasonable expectation of privacy on these facts to decide this case.
D. Exigent Circumstances
¶ 69. Irrespective of whether Subdiaz-Osorio had both a subjective and objective reasonable expectation of privacy in his cell phone location data, and irrespective of whether obtaining that data was a search without a warrant under the Fourth Amendment, I conclude that the tracking of Subdiaz-Osorio's cell phone location fell within the exigent circumstances exception to the warrant requirement. Consequently, the search did not violate Subdiaz-Osorio's Fourth Amendment rights.
¶ 70. Seeking and obtaining the defendant's cell phone location information is assumed to be a search in this opinion because of the privacy implications. Under *82 the exigent circumstances exception,[32] a warrantless search does not violate a suspect's Fourth Amendment rights if: (1) the government can show that there is probable cause to believe that "evidence of a crime will be found"; and (2) there are exigent circumstances. Hughes, 233 Wis. 2d 280, ¶¶ 17, 21 (citations omitted). To establish probable cause for a search, the government must show that there is a " 'fair probability' that contraband or evidence of a crime will be found in a particular place." Id., ¶ 21 (citation omitted).
¶ 71. The probable cause standard also has been employed when there is "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense." State v. Henderson, 2001 WI 97, ¶ 19, 245 Wis. 2d 345, 629 N.W.2d 613 (quoting Dalia v. United States, 441 U.S. 238, 255 (1979)) (internal quotation marks omitted); see Warden v. Hayden, 387 U.S. 294, 307 (1967). This formulation may be a more suitable fit for searches of cell phone location information when the primary goal of the search is to obtain information to apprehend the suspect.[33] "In regard to probable cause, the supreme court has stated that [the Court] deal[s] with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, [must] act." State v. Secrist, 224 Wis. 2d 201, 215, 589 N.W.2d *83 387 (1999) (quoting State v. Wisumierski, 106 Wis. 2d 722, 739, 317 N.W.2d 484 (1982)) (brackets in original) (internal quotation marks omitted).
¶ 72. The court determines whether there was probable cause by an objective standard and asks whether the police acted reasonably.[34] State v. Robinson, 2010 WI 80, ¶ 26, 327 Wis. 2d 302, 786 N.W.2d 463. "The core requirement of probable cause serves to 'safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" State v. Riper, 193 Wis. 2d 69, 81, 532 N.W.2d 698 (1995) (emphasis added) (quoting State v. DeSmidt, 155 Wis. 2d 119, 130, 454 N.W.2d 780 (1990)).
¶ 73. Exigent circumstances exist if, "measured against the time needed to obtain a warrant," and under the facts known at the time, it was objectively reasonable for law enforcement to conduct a warrantless search when: (1) law enforcement was engaged in a "hot pursuit"; (2) there was a threat to the safety of either the suspect or someone else; (3) there was a risk of destruction of evidence; or (4) the suspect was likely to flee. Hughes, 233 Wis. 2d 280, ¶¶ 24-25 (citing State v. Smith, 131 Wis. 2d 220, 229, 388 N.W.2d 601 (1986)). The objective exigent circumstances test asks "whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life, *84 risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape." Id., ¶ 24 (citing Smith, 131 Wis. 2d at 230). The State has the burden to prove that exigent circumstances justified the search. Ferguson, 317 Wis. 2d 586, ¶ 20.
¶ 74. Kenosha police had probable cause to conduct a search because there was a "fair probability" that evidence of the stabbing would be found at the location of Subdiaz-Osorio's cell phone. Eyewitnesses had informed the police that Subdiaz-Osorio had fatally stabbed his brother less than 24 hours before the search and that he had admitted to the stabbing. Subdiaz-Osorio was now missing but known to have borrowed an automobile. The murder weapon had not been found. Subdiaz-Osorio's cell phone had not been located. There was a fair probability that if Subdiaz-Osorio had his phone, evidence would be found at that location.
¶ 75. Of course, the police wanted to apprehend Subdiaz-Osorio because of the accumulated evidence they had against him, but the police also had a hope and expectation that Subdiaz-Osorio's apprehension would yield additional evidence of the crime. This evidence included the defendant's clothing if he was wearing any of the same clothing he wore at the time of the stabbing, the murder weapon if he had not discarded his knives, and his cell phone if he made calls to additional people to whom he made admissions. The defendant himself could yield DNA evidence and could make inculpatory statements when questioned. Any person accompanying Subdiaz-Osorio would likely have heard incriminating admissions. For instance, the driver of the vehicle, Roberto, would surely be asked why he was driving Subdiaz-Osorio south. Where were they going and why were they going there? Did they avoid major highways at any point during the trip to avoid detection? If so, why?
*85 ¶ 76. Given that they had probable cause to track Subdiaz-Osorio's cell phone, the Kenosha police arguably had their pick of three exigent circumstances.[35] There was a threat to safety, risk of destruction of evidence, and a likelihood that Subdiaz-Osorio would flee.[36] The threat to safety and risk of destruction of evidence stem in part from the fact that no murder weapon was ever recovered after Subdiaz-Osorio killed his brother. It was important to find Subdiaz-Osorio quickly to prevent him from destroying or disposing of his knives and clothes.
¶ 77. Moreover, it would be difficult to say that a potentially armed individual who recently committed a homicide did not create a threat to safety. Subdiaz-Osorio argues that stabbing his brother did not automatically support the inference that he was dangerous to others, but police do not have to have conclusive proof that a suspect is likely to harm someone in order to satisfy the exigent circumstances exception. Richter, 235 Wis. 2d 524, ¶ 40 [37]
*86 ¶ 78. Richter demonstrates that reasonableness is at the center of the exigent circumstances analysis, and in the present case, it was reasonable for the Kenosha police to believe that a potentially armed homicide suspect created an exigent threat to the safety of others. See id. ("[P]ursuit of a suspect known to be armed and dangerous would establish exigent circumstances implicating a threat to physical safety."). Though it is not necessarily required, the police had evidence that Subdiaz-Osorio was armed and dangerous because he had just committed a homicide, and it was likely that he still had the murder weapon. In fact, Subdiaz-Osorio told Liborio that he did not want to be arrested, which could lead a reasonable law enforcement officer to infer Subdiaz-Osorio might become violent if confronted. The Kenosha police had no way of knowing how desperate Subdiaz-Osorio might become to avoid apprehension, or to obtain money or shelter to facilitate escape. They did know that this was an individual who was dangerous enough to stab someone in the head, and they could reasonably believe that the delay in getting a warrant would seriously endanger life. Therefore, it was proper for them to conduct a warrantless search to find Subdiaz-Osorio as quickly as possible.
¶ 79. In addition, the police reasonably could have believed that the likelihood that Subdiaz-Osorio would flee created an exigent circumstance. The exigent circumstance exception for a fleeing suspect exists if *87 getting a warrant would "greatly enhance the likelihood of the suspect's escape." Hughes, 233 Wis. 2d 280, ¶ 24 (citation omitted). Subdiaz-Osorio was in the country illegally, had just committed a grisly murder, and the police determined that his family in Illinois had not heard from him. The police knew that he was from Mexico and had family there.[38] They knew that he had borrowed his girlfriend's car and had warned Liborio that he did not want to be arrested. Therefore, there was a strong inference that he would try to flee, and time was of the essence to find him before he left the country.
¶ 80. It is not clear from the record exactly when Subdiaz-Osorio left Kenosha. Clearly, it was before 10 a.m. on February 8, 2009, because the police began to interview Estella by 10 a.m. It was probably before 9:27 a.m. because three of Subdiaz-Osorio's acquaintances went to the Kenosha Safety Building at 9:27 a.m. Kenosha County borders the State of Illinois so that Subdiaz-Osorio would likely have been in Illinois in less than 15 minutes after he left Estella. He probably would have been able to be in Chicago in less than an hour and a half. Chicago provides multiple forms of transportation out of the area besides automobile— *88 airplanes, trains, buses. Chicago also provided the opportunity to buy or rent a different vehicle and buy a different cell phone, perhaps a prepaid cell phone. All this is predicated on Subdiaz-Osorio traveling south rather than north or west. The police could only speculate as to his plans or his route.
¶ 81. By the time he was arrested at 6:11 p.m. on February 8, Subdiaz-Osorio was in Arkansas, which meant that he had traveled a significant distance since he left that morning. The police could not have known what method of transportation he would use as he attempted to escape or how quickly he would be able to leave the country if that were his goal. Because time was crucial to apprehend a fleeing suspect, the Kenosha police acted properly in the face of exigent circumstances and could not delay to secure an additional warrant.[39]
E. Constitutional Protections Against Self-Incrimination
¶ 82. In addition to his Fourth Amendment claims, Subdiaz-Osorio argues that Kenosha police violated his Fifth Amendment rights when they continued to question him after he asked about how he could get an attorney. I conclude that Subdiaz-Osorio's question about obtaining an attorney was equivocal, and Officer Torres did not violate Subdiaz-Osorio's Fifth Amendment rights by continuing to question him.
¶ 83. The Fifth Amendment to the United States Constitution reads in part: "No person. . . shall be *89 compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."[40] U.S. Const, amend. V. The Fifth Amendment is the source of the so-called Miranda warnings, which advise a defendant that he has a right to an attorney, as a means to safeguard his right to remain silent. Miranda v. Arizona, 384 U.S. 436, 467-73 (1966).
¶ 84. Having been advised of his right to an attorney and his right to remain silent, a suspect in custody must clearly invoke those rights. "[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Davis v. United States, 512 U.S. 452, 461 (1994). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Jennings, 252 Wis. 2d 228, ¶ 29 (quoting Davis, 512 U.S. at 459). The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would un *90 derstand the statement to be a request for an attorney." Id., ¶ 30 (quoting Davis, 512 U.S. at 459).
¶ 85. In Davis, the Supreme Court determined that when the suspect said, "Maybe I should talk to a lawyer," it was not an unequivocal request for counsel. Davis, 512 U.S. at 462. This court followed Davis in Jennings and decided that the defendant's statement, "I think maybe I need to talk to a lawyer," was not clear enough to invoke the right to counsel, and the interrogating officers did not have to cease questioning or attempt to clarify what the suspect meant. Jennings, 252 Wis. 2d 228, ¶ 44.
¶ 86. In the present case, Subdiaz-Osorio said, "How can I do to get an attorney here because I don't have enough to afford for one." The interview took place in Spanish (so that what we have before us is a translation at the suppression hearing), but it appears as though Subdiaz-Osorio was asking about the process of obtaining an attorney rather than asking for counsel to be present during the interview.
¶ 87. The context in which Subdiaz-Osorio's question arose is important and a vital element in the totality of the circumstances. Officer Torres had just explained the extradition process to Subdiaz-Osorio and told him that he would have to appear before a judge in Arkansas before a decision on whether he would return to Wisconsin. It was reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney for his extradition hearing, especially since Subdiaz-Osorio continued to answer questions and remained cooperative for the rest of the interview. In addition, prior to sitting down for the interview, Subdiaz-Osorio signed a waiver of rights form, which Officer Torres had read to him in Spanish. Our case law is clear that it is not enough for a suspect to say *91 something that the interviewer might interpret as an invocation of the right to counsel. Id., ¶ 29. The invocation of that right must be unequivocal. In this case it was not.
IV CONCLUSION
¶ 88. Although the court is divided on the rationale for an affirmance, the decision of the court of appeals is affirmed.
By the Court. — The decision of the court of appeals is affirmed.

 This opinion refers to Nicolas Subdiaz-Osorio and his brother, Marco Antonio Ojeda-Rodriguez, by their full hyphenated last names. For the sake of simplicity, the opinion refers to all other witnesses, other than police officers, by their first names.

 A court order that meets the requirements of the Fourth Amendment may function as a warrant. State v. Tate, 2014 WI 89, ¶ 2 & n.4, 357 Wis. 2d 172, 849 N.W.2d 798; see also State v. Sveum, 2010 WI 92, ¶ 39, 328 Wis. 2d 369, 787 N.W.2d 317. However, when a statute provides procedures for obtaining a warrant in a given set of circumstances, law enforcement should follow the statute to ensure that a search conducted under the circumstances contemplated by the statute does not violate a person's Fourth Amendment rights.

 Justice Ann Walsh Bradley and Justice N. Patrick Crooks believe that tracking a cell phone's location is a search that requires a search warrant. Chief Justice Shirley S. Abrahamson shares this view in her dissent.

 Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael J. Gableman agree that the facts of this case qualify for the exigent circumstance exception to the warrant requirement.

 Justice N. Patrick Crooks, Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael J. Gableman agree that there was no Fifth Amendment Miranda *50 violation in this case. Miranda v. Arizona, 384 U.S. 436 (1966).

 Unless otherwise indicated, the events described in this section occurred in 2009.

 There is no dispute that Officer Torres speaks Spanish fluently.

 A temporary want means "that the suspect was alleged to have committed a felony and should be apprehended promptly, and that there was information sufficient to support an arrest warrant, but that no arrest warrant had yet been issued." State v. Collins, 122 Wis. 2d 320, 322 n.1, 363 N.W.2d 229 (Ct. App. 1984).

 CIB is part of the Wisconsin Department of Justice's Division of Law Enforcement Services. Crime Information Bureau, Wis. Dep't of Justice, http://www.doj.state.wi.us/dles/ cib/crime-information-bureau (last visited July 14, 2014). CIB "operates and manages the Transaction Information for the Management of Enforcement or TIME System." Time & Technical Unit, Wis. Dep't of Justice, http://www.doj.state.wi.us/ dles/cib/time-and-technical-unit (last visited July 14, 2014).
The TIME/NCIC Systems allow for entry of a wanted person record even if no warrant has been issued in special circumstances. Agencies that have knowledge by police that a felony was committed and who the person was that committed the felony but no warrant has been issued yet may enter the subject as a wanted person in the Temporary Felony category while the process for obtaining a felony warrant is pursued.
The want can be entered into CIB only or CIB and NCIC, and the entry remains on file for 48 hours before being automatically purged. As the entry remains on the system for such a short amount of time, agencies are not allowed to add detainer information to such a record.
TIME System Newsletter Crime Information Bureau, Wis. Dep't of Justice, https://wilenet.org/html/cib/news-time/201211.pdf (Nov. 2012).

 NCIC is "an electronic clearinghouse of crime data that can be tapped into by virtually every criminal justice agency *55 nationwide, 24 hours a day, 365 days a year." National Crime Information Center, FBI, http://www.fbi.gov/about-us/cjis/ncic (last visited July 14, 2014). The FBI operates NCIC in conjunction with other federal, state, local, and tribal criminal justice entities. Id. For NCIC,
A "Temporary Felony Want" may be entered when a law enforcement agency has need to take prompt action to establish a "want" entry for the apprehension of a person who has committed, or the officer has reasonable grounds to believe has committed, a felony and who may seek refuge by fleeing across jurisdictional boundaries and circumstances preclude the immediate procurement of a felony warrant. A "Temporary Felony Want" shall be specifically identified as such and subject to verification and support by a proper warrant within 48 hours following the entry of a temporary want. The agency originating the "Temporary Felony Want" shall be responsible for subsequent verification or re-entry of a permanent want.
Privacy Act of 1974; Notice of Modified Systems of Records, 64 Fed. Reg. 52343-01 (Sept. 28, 1999).

 According to Wis. Stat. § 968.27(13) (2009-10),
"Pen register" means a device that records or decodes electronic or other impulses that identify the numbers dialed or otherwise transmitted on the telephone line to which the device is attached. "Pen register" does not include any device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by the provider or any device used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business.
Wis. Stat. § 968.27(13) (2009-10).
" 'Trap and trace device' means a device that captures the incoming electronic or other impulses that identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." Wis. Stat. § 968.27(15) (2009-10).

 Miranda, 384 U.S. 436.

 All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 It is unclear exactly what evidence the police obtained after Subdiaz-Osorio's arrest. However, the State filed a "Notice of Intent to Use DNA Evidence at Trial and Summary of Expert Testimony" and attached Laboratory Findings that contained an analysis of blood stains on Subdiaz-Osorio's shoes and pants. In the DNA analyst's opinion, the blood on Subdiaz-Osorio's shoes and pants belonged to Ojeda-Rodriguez.

 In his motion, Subdiaz-Osorio argued that there was no probable cause to suggest he had the requisite intent to kill under Wis. Stat. § 940.01(l)(a).

 "An order denying a motion to suppress ... may be reviewed upon appeal from a final judgment or order notwithstanding the fact that the judgment or order was entered upon a plea of guilty .. . ." Wis. Stat. § 971.31(10).

 Samuel D. Warren & Louis D. BrandEis, The Right to Privacy, 4 Harv. L. Rev. 193, 195 (1890) (footnote omitted).

 See Vera Bergelson, It's Personal But Is It Mine? Toward Property Rights in Personal Information, 37 U.C. Davis L. Rev. 379, 427-29 (2003) (citing numerous polls in which citizens expressed concerns about their privacy and revealed that they wanted more legal protection for privacy, especially for personal information on the internet).

 There are different ways in which cell phone companies, and consequently, the government, can track a cell phone. Providers can obtain a subscriber's location information using global positioning system (GPS) technology or triangulation. GPS technology can calculate an accurate location within 20 meters by "measuring the time it takes for a signal to travel the distance between satellites and a cell phone's GPS chip." Who Knows Where You've Been? Privacy Concerns Regarding the Use of Cellular Phones As Personal Locators, 18 Harv. J.L. & Tech. 307, 308 (2004) [hereinafter Who Knows Where You've Been?]. To locate a phone by triangulation, two or more cell towers that receive signals from an active phone compare the phone's signals and calculate location based on the difference between the times that the signals arrived or the angle of the signals. Id. When a cell phone provider "pings" a phone pursuant to law enforcement's request, the provider enters the phone number in a computer program to make the cell phone identify its GPS *68 coordinates to the provider. United States v. Caraballo, 963 F. Supp. 2d 341, 350 (D. Vt. 2013).

 One commentator noted:
Not surprisingly, cell phone users regard access to their location data as yielding private data about their locations. A research report found that seventy-three percent of cell phone users surveyed favored "a law that required the police to convince a judge that a crime has been committed before obtaining [historical] location information from the cell phone company.1'
Susan Freiwald, Cell Phone Location Data and the Fourth Amendment: A Question of Law, Not Fact, 70 Md. L. Rev. 681, 744 (2011) (brackets in original) (footnote omitted). Others have similarly posited that "[w]hile society may be willing to accept the idea of collecting information associated with the origination and termination of calls, people are likely to reject the prospect of turning every cell phone into a tracking device." Who Knows Where You've Been?, supra note 19, at 316.

 Annual Wireless Industry Survey, CTIA, http://www. ctia.org/your-wireless-life/how-wireless-works/annual-wirelessindustry-survey (last visited July 14, 2014).

 The Wisconsin Constitution's text is almost identical to the language in the United States Constitution.
The right of the people to he secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
Wis. Const, art. I, § 11. "Historically, we have interpreted Article I, Section 11 of the Wisconsin Constitution in accord with the Supreme Court's interpretation of the Fourth Amendment." State v. Arias, 2008 WI 84, ¶ 20, 311 Wis. 2d 358, 752 N.W.2d 748 (citations omitted). Thus, this opinion will not explicitly address the Wisconsin Constitution in the analysis, but the analysis will apply to both constitutions.

 The United States Supreme Court recently issued a decision in Riley v. California, 573 U.S. _, No. 13-132, slip op. (June 25, 2014), in which it determined that police must obtain a warrant before searching the contents of a cell phone in a search incident to an arrest. Id. at *28. The Court acknowledged that cell phones are capable of containing large quantities of private information, including historical location information, but the Court's decision did not address acquisition of contemporaneous cell phone location information like the tracking of Subdiaz-Osorio's cell phone in this case. See id. at *18 & n.l, 19-20.

 See, United States v. Jones, 565 U.S. _, 132 S. Ct. 945, 953 (2012) ("Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."); Marc McAllister, The Fourth Amendment and New Technologies: The Misapplication of Analogical Reasoning, 36 S. iLL. U. L.J. 475, 517-18 (2012) (footnote omitted) (stating that cell phone tracking "does not require the installation of any device; rather, the telephone itself does the work, making the Jones majority's trespass rationale inapplicable.").

 During the writing of Tate and this opinion, Governor Scott Walker signed into law 2013 A.B. 536, which requires law enforcement, with some exceptions, to obtain a warrant before *72 obtaining cell phone location information. 2013 Wis. Act 375; see Wis. Stat. § 968.373 (2013-14). The new law went into effect on April 25, 2014.

 An anachronism in today's wireless world, the phone booth calls forth both a sense of irony and nostalgia as it sits unassumingly at the center of modern Fourth Amendment jurisprudence.
The virtual elimination of telephone booths and payphones has made it difficult for a citizen away from home to make a telephone call without using a traceable cell phone. Even at home, people today are less reliant on a land line than in the past.

 The Policy defines CPNI on pages one and two of the Policy: "CPNI is information Sprint Nextel obtains or creates when it provides wireline or mobile wireless telecommunications services to a customer. CPNI includes the types of services purchased, how the services are used, and the billing detail for those services."
On page four, the Policy says CPNI "is information about your phone usage, which is a special category of personal information."
Page seven adds to the definition by stating that "Location information derived from providing our voice service... is CPNI

 The title of this paragraph suggests that the disclosure disclaimer is to protect Sprint, not the customer.

 Wisconsin Stat. § 968.375(15) permits Sprint and other wireless services providers to disclose customer information without a subpoena or warrant if:
The provider of electronic communication or remote computing service believes in good faith that an emergency involving the danger of death or serious physical injury to any person exists and that disclosure of the information is required to prevent the death or injury or to mitigate the injury.
Wis. Stat. § 968.375(15)(b). Section 968.375 took effect on May 28, 2010. The Federal Stored Communications Act also permits a similar disclosure. 18 U.S.C. § 2702(c)(4) (2006) (provider may disclose information "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency"). However, statutes granting cell phone companies authority to disclose information do not necessarily grant law enforcement authority to conduct the search for that information without a court order.

 See United States v. Takai, 943 F. Supp. 2d 1315, 1323 (D. Utah 2013) (probable cause and exigent circumstances justified detective's application for cell phone pinging under 18 U.S.C. § 2702).

 See Orin S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L. Rev. 503, 504-05 (2007) (criticizing the numerous, inconsistent tests to determine what society accepts as a reasonable expectation of privacy).

 When the exigent circumstances exception applies, a citizen's privacy right "must give way to the compelling public interest in effective law enforcement." State v. Robinson, 2010 WI 80, ¶ 24, 327 Wis. 2d 302, 786 N.W.2d 463 (citations omitted).

 The new statute requiring a warrant to track cell phone location information requires "probable cause to believe the criminal activity has been, is, or will be in progress and that identifying or tracking the communications device will yield information relevant to an ongoing criminal investigation." Wis. Stat. § 968.373(3)(e) (2013-14).

 "In both an arrest warrant and a search warrant context, probable cause eschews technicality and legalisms in favor of a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'" State v. Riper, 193 Wis. 2d 69, 83, 532 N.W.2d 698 (1995) (quoting State v. Higginbotham, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991)).

 Wisconsin Stat. § 968.373(8)(a)2. (2013-14) provides an exception to the warrant requirement based on exigency if "[a]n emergency involving danger of death or serious physical injury to any person exists and identifying or tracking the location of the communications device is relevant to preventing the death or injury or to mitigating the injury."

 "Hot pursuit" is not at issue in this case because a "hot pursuit" occurs "where there is an immediate or continuous pursuit of [a suspect] from the scene of a crime." State v. Richter, 2000 WI 58, ¶ 32, 235 Wis. 2d 524, 612 N.W.2d 29 (brackets in original) (citation omitted) (internal quotation marks omitted). The pursuit of Subdiaz-Osorio was not immediate or continuous.

 Richter involved a situation in which an eyewitness told police that a burglar fled from her trailer and went into a trailer across the street. Richter, 235 Wis. 2d 524, ¶ 1. This court determined that even though there was no information to suggest that the burglar was armed or had violent tendencies, *86 the officer could reasonably believe that there was a threat to safety and could conduct a warrantless search of the trailer based on exigent circumstances. Id., ¶¶ 40-41. A requirement that law enforcement "have affirmative evidence of the presence of firearms or known violent tendencies on the part of the suspect before acting to protect the safety of others is arbitrary and unrealistic and unreasonably handicaps the officer in the performance of one of his core responsibilities." Id., ¶ 40.

 This case calls to mind the situation in State v. Ndina, 2009 WI 21, ¶¶ 99-102, 315 Wis. 2d 653, 761 N.W.2d 612 (Prosser, J., concurring), in which the defendant booked a flight back to his home country of Albania after stabbing a relative in the neck. An arrest warrant was obtained, and authorities tried to act quickly before the defendant could fly back to Albania. Even though he spoke almost no English, Ndina evaded capture in the United States and was not apprehended in Albania until several months later. Id., ¶¶ 101-02. The warrant in Ndina was for an arrest, not a search, but that case illustrates how precious time can be when authorities are trying to capture a fleeing suspect.

 The events in this case occurred on February 7 and 8, 2009, in Kenosha. The events in Tate occurred on June 9, 2009, in Milwaukee. This case represents the earliest reported case of cell phone location tracking in Wisconsin.

 Similar to the United States Constitution, the Wisconsin Constitution provides, "No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself." Wis. Const, art I, § 8(1). The Wisconsin Constitution has been interpreted to offer the same protection as the United States Constitution's Fifth Amendment when it comes to invoking the right to counsel in a custodial interrogation. State v. Jennings, 2002 WI 44, ¶¶ 41-42, 252 Wis. 2d 228, 647 N.W.2d 142.

 Miranda v. Arizona, 384 U.S. 436 (1966).