REILLY, P.J.[1]
¶1 Eric R. Burrows appeals from a judgment convicting him of unlawful phone use, in violation of WIS. STAT. § 947.012(1)(b), and defamation, in violation of WIS. STAT. § 942.01(1). Burrows sent threatening and harassing letters, orchestrated inflammatory and derogatory voicemail messages, and delivered a baby python snake to E.W., the victim in this case. On appeal, Burrows challenges his arrest, the seizure of evidence following his arrest, and the legality of search warrants issued for his property. For the reasons that follow, we affirm the circuit court's decision.
BACKGROUND
¶2 E.W. first contacted law enforcement in August 2016 to report that she was receiving threatening voicemails and a letter at her place of employment. She had recently ended a relationship with Burrows and believed he was responsible. The letter was sent to her employer and written from the perspective of a female. The letter informed the employer that it needed to do something about the "blond whore" that worked there as "[t]hat bitch has been screwing my man," B.K.,[2] and "if you don't do something about that whore, I will come to your store and take care of her myself in my own way in front of your employees and customers, and that is a promise." The letter ended, "I would take this very serious cuz I have nothing to lose besides him. I would think you people would be able to control your employees but I guess you don't have any morals."
¶3 The voicemails, left on August 3 and 8, were on E.W.'s work phone number from an outside, blocked line. The first appeared to be a female voice yelling for E.W. to "leave her boyfriend alone and refers to her as the 'blond bitch' and if she doesn't leave him alone, she is going to come to her place of employment and pull out her 'fucking hair' and ... to 'back the fuck off.' " The second was more of the same, but also mentioned E.W.'s son joining the army and that she "hoped that her son didn't have any problems now in the army." The officer who listened to the voicemail indicated that "it appears as if someone is reading off a piece of paper into the message because the female voice appears to stumble over her words which she wanted to say and then restates it."
¶4 The officer questioned B.K. about his past, and B.K. indicated that he had not had a serious relationship "within the last couple years." B.K. also listened to the voicemails but did not recognize the voice. He did "not believe it is anybody in his personal background that would be responsible for leaving these messages or sending the letter to their employer."
¶5 The investigation was turned over to Detective Joel Clark of the Sheboygan Police Department. E.W. reported to Clark that Burrows had been sending her multiple text messages, emails, and phone calls-fifty emails sent over the course of eight days and over 150 texts sent over twelve days-ranging from asking her to get back together to accusing her of lying and cheating. Burrows also sent E.W. a nude picture of herself, threatening to share the picture on social media.
¶6 E.W.'s ex-husband also reported receiving a letter. The letter alleged that the author "found [his] name on face book" and informed him in an expletive-ridden rant of E.W. and B.K.'s relationship. The letter went on to say that "if you care about that dumb blonde cunt and your son[,] I would talk to that fucking whore and tell her to find [someone else]." The author again threatened E.W.'s son, stating that "I have family and met a lot of friends in the army through [B.K.] I hope your pot head son doesn't have a difficult time now with the army, cause of that dumb cunts [sic] actions." The letter ended: "I have nothing to lose!" Clark observed that the handwriting on the envelope sent to E.W.'s ex-husband was different than the handwriting on the letter sent to E.W.'s employer, and E.W. reported that it was "similar to the handwriting she had known to be from" Burrows.
¶7 E.W.'s son's army recruiter also received a letter written from the point of view of her son's "friend Matt," accusing him of a "marijuana addiction" and suggesting that E.W. "helps him hide it by buying him a detox solution at GNC."
¶8 On August 17, 2016, E.W. contacted Clark regarding a suspicious package that was left at the main office of her apartment complex. The secretary reported receiving two separate phone calls regarding whether the package was delivered to E.W. The first caller was a male, and according to caller identification, the call came from Burrows' place of employment. The second call E.W. recognized as Burrows' cell phone number,[3] and the caller was a female claiming that she was E.W.'s sister and explaining that the package contained cheese and meat and she wanted to make sure it was delivered. After investigation, a live ball-python snake was found in the package with a note: "Surprise you lying cunt. Enjoy, this [is] who you are. Now do u care."
¶9 Clark determined that he had sufficient probable cause to arrest Burrows for stalking, and he attempted unsuccessfully to locate Burrows that day. After being unable to locate Burrows, Clark entered a temporary felony arrest warrant into the statewide law enforcement agency system, TIME.[4] The next day, August 18, Clark coordinated with the Manitowoc County Sheriff's Department to apprehend Burrows during a traffic stop as Clark felt that was "the safest way to go about it." Clark and Detective Cameron Stewart, another Sheboygan detective, waited outside of Burrow's place of employment in an unmarked squad, while the Manitowoc County deputies waited down the road in marked squad cars. When Burrows emerged, Manitowoc County deputies conducted a traffic stop, took him into custody, handcuffed him, and placed him in the back of a squad car. A marked squad car from the Sheboygan Police Department then arrived on scene to transport Burrows back to Sheboygan.
¶10 While Burrows was in custody, Clark and Stewart searched Burrows' vehicle and found a cell phone sitting unobstructed in the center console along with a yellow sheet of paper with a handwritten note similar to the content of the letter sent to E.W.'s employer on the passenger seat. The note appeared to be a draft of another letter. When Burrows questioned the reason for his arrest, Clark referenced the letters, and Burrows responded, "[T]hose letters aren't coming from me," indicating that he had knowledge of the letters. Clark also told Burrows, untruthfully, that there were surveillance cameras outside E.W.'s apartment complex and the video showed Burrows leaving a box there. Burrows did not deny that he was responsible for the package, stating "maybe that a snake, if they had surveillance, was in the box." He noted, however, that the package "was not going to be about hurting or scaring anyone, it's about people lying to somebody."
¶11 Clark applied for and was granted a search warrant for Burrows' home, phone, computer, cell phone records, Google location data, hair, and buccal swabs. The search revealed Google searches for E.W.'s apartment, place of employment, E.W.'s ex-husband's information, as well as searches about "what is stalking a person." That same day, E.W. received another letter at work.[5] This time the letter was enclosed in a get well card and was similar in content to the other letters, except it referenced the snake, telling E.W. to "go back to your little snake hole."
¶12 The State charged Burrows with felony stalking pursuant to WIS. STAT. § 940.32. Burrows moved to dismiss and suppress fruits of an illegal arrest, illegal search, and all search warrants. The circuit court held a hearing and denied the motions. Burrows pled guilty to one misdemeanor charge each of unlawful phone use and defamation, domestic abuse, and entered into a deferred conviction agreement on the felony stalking charge. Burrows appeals.
DISCUSSION
Probable Cause to Arrest
¶13 Burrows presents several arguments challenging his arrest and subsequent searches of his property on appeal. We address first whether probable cause existed to arrest Burrows for stalking. Upon review of an order granting or denying a motion to suppress evidence, we will uphold a circuit court's findings of fact unless they are clearly erroneous. See WIS. STAT. § 805.17(2). Whether a set of facts establishes probable cause to arrest presents a question of law this court reviews independently of the circuit court. State v. Kasian , 207 Wis. 2d 611, 621, 558 N.W.2d 687 (Ct. App. 1996). Burrows argues that "stalking requires 'a course of conduct.' Here, however, the information available to the police, at best, pointed to Burrows' possible involvement in a single act: the delivery of the non-poisonous snake to E.W.'s apartment complex." The States counters that there was "ample circumstantial evidence" to support Burrows' arrest for stalking E.W. We agree.
¶14 "Probable cause is the sine qua non of a lawful arrest. Probable cause refers to the quantum of evidence which would lead a reasonable police officer to believe that defendant committed a crime." State v. Mitchell , 167 Wis. 2d 672, 681, 482 N.W.2d 364 (1992). It is not necessary that the evidence establish proof beyond a reasonable doubt or that guilt is more probable than not. Id. at 681-82. The objective facts need only lead to the conclusion that guilt is more than a possibility. State v. Richardson , 156 Wis. 2d 128, 148, 456 N.W.2d 830 (1990). This is a practical test based on "practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." State v. Ehnert , 160 Wis. 2d 464, 469, 466 N.W.2d 237 (Ct. App. 1991). "The information which constitutes probable cause is measured by the facts of the particular case." Mitchell , 167 Wis. 2d at 682.
¶15 We conclude that there was a sufficient "quantum of evidence" within Clark's knowledge at the time Burrows was arrested to lead a reasonable police officer to believe that he committed the crime of stalking. Although largely circumstantial, Clark's suspicion of Burrows was not a hunch; the evidence pointed clearly to Burrows' involvement. See State v. Ritchie , 2000 WI App 136, ¶16, 237 Wis. 2d 664, 614 N.W.2d 837 ("Circumstantial evidence can sometimes be, and often is, stronger and more satisfactory than direct evidence.").
¶16 First, Burrows was directly linked to the snake in the box through the two phone calls that were made to the apartment complex. Although one was a female voice, it came from Burrows' cell phone number, which E.W. identified.[6] The second caller was a male, and the call came from Burrows' work phone number. The secretary also suggested the voice sounded the same as a previous male caller looking for E.W.'s address.
¶17 Second, information contained in the letters connected Burrows to the crime. Although the letters were written from the perspective of a female who appeared to be upset that B.K. was in a relationship with E.W., B.K. reported to police that he did not have a girlfriend or a wife who would be writing these letters. The letters also contained information that only someone who was familiar with E.W.'s family would know; a former girlfriend of B.K. would not have information about E.W.'s son or his desire to join the army. Further, the letters sent to E.W.'s employer, her ex-husband, the army recruiter, and the letter in the box with the snake all contained the same inflammatory and derogatory language and allegations. E.W. also identified Burrows' handwriting in the letter written to her ex-husband.
¶18 Third, like the letters, the voicemail messages left at E.W.'s employer also connect to Burrows. Again, the caller was female, but there was no evidence of a female in B.K.'s life and he did not recognize the voice. The information in the voicemails was similar to that in the letters, which, again, contained personal information about E.W. and her family, and an officer reported, after hearing the voicemails, that they appeared to be scripted as the caller was stumbling over her words.
¶19 Finally, Burrows' behavior after E.W. ended their relationship certainly suggested he was a jilted lover with motive to commit this crime. The record indicates that Burrows was sending E.W. numerous texts, phone calls, and emails asking to rekindle the relationship, and E.W. repeatedly rebuffed his attempts. Burrows' texts to E.W. were filled with manipulative messages, accusing her of lying to him, leading him on, and moving on. He also sent the nude picture of E.W. by text to her and threatened to share it.
¶20 Although circumstantial, we agree that under the "quantum of evidence" and the totality of the facts and circumstances surrounding Burrows and E.W., a reasonable officer would believe that Burrows committed the crime of stalking. Accordingly, we agree with the circuit court that Clark had probable cause to arrest Burrows.
Temporary Arrest Warrant
¶21 Burrows next challenges his arrest based on the use of the temporary arrest warrant that Clark entered into the TIME system. We begin with the basic premise that police officers are not required to have an arrest warrant in order to arrest a suspect as long as the officer has probable cause to support the arrest. See e.g. , WIS. STAT. § 968.07(1)(d) ; Gramenos v. Jewel Cos. , 797 F.2d 432, 440 (7th Cir. 1986) ("When the arrest for a felony occurs in a public place in the daytime, probable cause is the only question."); United States v. Fernandez-Guzman , 577 F.2d 1093, 1097 (7th Cir. 1978) ("[I]n the area of arrests made in a public place, an arrest warrant has never been considered to be constitutionally mandated even when there was opportunity for one to be obtained.").
¶22 Burrows takes issue with Clark's use of a "temporary arrest warrant," also called a "temporary felony want," in this case. He admits that police may arrest suspects without an arrest warrant, but he claims that the police cannot issue their own arrest warrants as that "authority lies exclusively within the province of the judicial branch" and that a temporary warrant is "a device to bridge the gap until a judicial warrant is obtained" but that is not how the temporary arrest warrant was used in this case. The State argues, however, that a temporary felony warrant is "a tool used by law enforcement officers to communicate to other law enforcement officers that probable cause exists to arrest an individual for a felony crime and that that person should be taken into custody immediately." We agree.
¶23 In State v. Subdiaz-Osorio , 2014 WI 87, ¶21 n.8, 357 Wis. 2d 41, 849 N.W.2d 748 (citation omitted), our supreme court described the process for a "temporary want," noting that "[a] temporary want means 'that the suspect was alleged to have committed a felony and should be apprehended promptly, and that there was information sufficient to support an arrest warrant, but that no arrest warrant had yet been issued.' " The court explained that police may put a temporary want on a defendant into the Crime Information Bureau (CIB), state system, and National Crime Information Center (NCIC), federal system. Id. , ¶21. These entries will remain in the system for only forty-eight hours. Id. , ¶21 n.9. The tool gives "[a]gencies ... knowledge ... that a felony was committed and who the person was that committed the felony." Id. (citation omitted).
¶24 We agree that a temporary arrest warrant is merely a tool used by officers to help apprehend a suspect that an officer has probable cause to believe committed a crime. As the parties noted, case law in Wisconsin addressing a temporary arrest warrant is scarce, with few cases even mentioning the practice and none investigating the constitutionality. We conclude that as an arrest warrant is not required to arrest an individual in a public place, the temporary arrest warrant, as it was used in this case, simply provided information to other officers that probable cause existed to arrest Burrows. Use of a temporary arrest warrant does not violate any constitutional principles provided there is probable cause to arrest the individual and it is not being used to enter into a private residence. Cf. Payton v. New York , 445 U.S. 573, 589-90 (1980) (holding that the fourth amendment prohibits warrantless entry into a person's home to arrest and search). As Clark had probable cause to arrest Burrows, the use of a temporary arrest warrant to seek help from his fellow officers in locating Burrows was permissible.
Collective Knowledge Doctrine
¶25 Burrows next challenges his arrest by the Manitowoc County Sheriff's Department as that specific department lacked probable cause at the time of the arrest. The State invokes the collective knowledge doctrine, arguing that the arrest was proper. Burrows claims that the collective knowledge doctrine requires that the knowledge leading to probable cause be communicated to Manitowoc County. We disagree.
¶26 To be lawful, an arrest must be based on probable cause, State v. Secrist , 224 Wis. 2d 201, 212, 589 N.W.2d 387 (1999), but the arresting officer need not "personally have in his [or her] mind knowledge sufficient to establish probable cause for the arrest," State v. Mabra , 61 Wis. 2d 613, 625, 213 N.W.2d 545 (1974). Rather, "[t]he police force is considered as a unit" and the officer "may rely on all the collective information in the police department" as long as "there is police-channel communication to the arresting officer" and the officer "acts in good faith." Id. (citing Whiteley v. Warden , 401 U.S. 560 (1971) ); see also United States v. Hensley , 469 U.S. 221, 231-32 (1985) (explaining that the "language in Whiteley suggests that ... [the] police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause.... In an era when criminal suspects are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction"). This is known as the collective knowledge doctrine. Under the collective knowledge doctrine, the court's assessment of whether an arrest is supported by probable cause is made by looking at the collective knowledge of the officers involved. See Mabra , 61 Wis. 2d at 625 ; State v. Pickens , 2010 WI App 5, ¶11, 323 Wis. 2d 226, 779 N.W.2d 1.
¶27 Burrows argues, based on State v. Black , 2000 WI App 175, 238 Wis. 2d 203, 617 N.W.2d 210, that Manitowoc County was not aware of the details related to probable cause so his arrest was invalid. In Black , two police detectives observed an individual who appeared to be engaged in a drug transaction. Id. , ¶¶2-3. As the person walked away, they asked another officer to check the person's identity without providing any basis for their suspicion. Id. The officer's identification check ultimately led to seizing cocaine from the person. Id. , ¶¶5-8. Although this court upheld the officer's action, we rejected the State's attempt to employ the collective knowledge doctrine in the case. We noted that in order for the doctrine to apply, "such information must actually be passed to the officer before he or she makes an arrest or conducts a search." Id. , ¶17 n.4; see also State v. Friday , 140 Wis. 2d 701, 712, 412 N.W.2d 540 (Ct. App. 1987), rev'd on other grounds , State v. Friday , 147 Wis. 2d 359, 434 N.W.2d 85 (1989) (citation omitted) (noting that "[i]n addition to examining the totality of the circumstances" we must also consider "the degree of communication between" the police officers, rather than the "sole knowledge" of one officer).
¶28 We disagree that the collective knowledge doctrine is as narrow as Burrows would like us to conclude. We do not share the assessment that Black requires that details underlying the probable cause determination be communicated to the responding officer before making an arrest as such a requirement would arguably conflict with the principle that the arresting officer need not "personally have in his [or her] mind knowledge sufficient to establish probable cause for the arrest."[7] See Mabra , 61 Wis. 2d at 625. We read Black as standing for the proposition that under the facts in Black , a police channel communication simply instructing an officer to "check[ ] out" someone for identification fails to invoke the collective knowledge doctrine. See Black , 238 Wis. 2d 203, ¶¶2-3, 17 n.4.
¶29 In Schaffer v. State , 75 Wis. 2d 673, 250 N.W.2d 326 (1977), overruled on other grounds by State v. Walker , 154 Wis. 2d 158, 185-86, 453 N.W.2d 127 (1990), for example, the arresting officer was shown a "teletype message from the Oshkosh Police Department which stated that a drugstore had been robbed in Oshkosh on January 7, 1975. The items stolen were listed and descriptions of the two suspects were included." Schaffer , 75 Wis. 2d at 675. Later, while out on patrol, the officer encountered two gentlemen and checked their identification, discovering them to be the suspects in the robbery, and both men were placed under arrest. Id. at 676. The arrest was upheld under the collective knowledge doctrine. Id. at 676-77. The officer in Schaffer was never provided the details as to why the men were suspects or what led to probable cause. See also State v. Taylor , 60 Wis. 2d 506, 515, 210 N.W.2d 873 (1973) ("Thus, the teaching of Whiteley [,401 U.S. at 568,] is that an officer, acting in good faith on the basis of a police dispatch, may assume at the time of the apprehension that probable cause has been established.").
¶30 Here, the computer-aided dispatch narrative dispensed by the Sheboygan Police Department regarding Burrows read:
08/17/2016 ... Narrative: ATL **OFFICER SAFETY** ERIC R. BURROWS ... A TEMPORARY WARRANT HAS BEEN ENTERED REGARDING SHEBOYGAN CASE C16-15346 STALKING. VICTIM IS [E.W.] ERIC IS KNOWN TO BE A NAZI SYMPATHIZER, AND IS HEAVILY ARMED AT HIS RESIDENCE. HE WILL LIKELY BE ARMED IN ANY VEHICLE HE IS DRIVING, BUT IT IS NOT KNOWN IF HE PERSONALLY CARRIES A WEAPON.... **USE CAUTION WHEN COMING IN CONTACT WITH ERIC AS HE HAS REPEATEDLY STATED HE HAS NOTHING TO LOSE.
The narrative also included details about what type of car he might be driving and what locations he frequented. The police-channel communication in this case contained sufficient information concerning Burrows' person, his crime, his victim, and his whereabouts to satisfy the requirement that there be sufficient police channel communication to the arresting officer. Additionally, the indication in the narrative that "a temporary warrant has been entered" clearly demonstrates to other officers that probable cause exists. In fact, this case went a step further in that Clark coordinated Burrows' arrest with Manitowoc County, suggesting some additional level of communication took place; thus, Manitowoc County was relying on more than a dispatch communication, which by itself would have been sufficient, to support Burrows' arrest. Accordingly, Burrows' arrest was proper under the collective knowledge doctrine.[8]
Search Warrants and Search Incident to Arrest
¶31 Finally, Burrows challenges the searches conducted subsequent to his arrest for stalking. He first claims that the search of his vehicle incident to his arrest was unlawful.[9] Searches conducted without a warrant are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." Katz v. United States , 389 U.S. 347, 357 (1967). One of those exceptions is a search incident to a lawful arrest, where "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Arizona v. Gant , 556 U.S. 332, 351 (2009). We have adopted the reasoning of Gant for searches and seizures in this state. State v. Dearborn , 2010 WI 84, ¶27, 327 Wis. 2d 252, 786 N.W.2d 97.
¶32 Burrows argues that the search incident to an arrest exception is not applicable in this case as Burrows was handcuffed in the back of a police vehicle at the time of the search and evidence of stalking was "not likely to be found in [his] vehicle" as he was not arrested for "the kind of stalking that might be conducted with a vehicle." We conclude that it was reasonable for Clark to believe that evidence of stalking would be found in Burrows' vehicle. As the State explains, Clark was at the very least aware that Burrows had utilized his cell phone to send numerous harassing text messages to E.W., to send a naked photo of E.W. and threaten to share it, and to call E.W.'s apartment complex to inquire about delivery of the snake. It was reasonable for Clark to conclude that Burrows' cell phone would be located in his vehicle, along with other evidence relating to the crime of stalking, including, but not limited to, additional letters (one was recovered), envelopes, and handwriting samples for comparison.
¶33 Burrows also argues that the search warrants obtained were not supported by probable cause. Sheboygan police obtained five search warrants for Burrows' property. The search warrants were based on facts alleged in affidavits submitted by Clark. According to Burrows, "[t]he affidavit supporting the search warrant does not allege that E.W. suffered serious emotional distress, nor does it allege she felt terrified," which is an element of the crime of stalking under WIS. STAT. § 940.32(2)(c). The State concedes that "none of the search warrants specifically state that [E.W.] suffered serious emotional distress," but it alleges that "the facts in this case clearly support that proposition."
¶34 "A search warrant may issue only on a finding of probable cause by a neutral and detached magistrate." State v. Higginbotham , 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991). "We accord great deference to the warrant-issuing judge's determination of probable cause and that determination will stand unless the defendant establishes that the facts are clearly insufficient to support a finding of probable cause." Id.
¶35 E.W. suffered, both emotionally and mentally, and any suggestion to the contrary is absurd. Burrows[10] threatened E.W. with physical harm in the letters and telephone calls; threatened to make a scene at her work, risking her employment; caused strain in her new relationship; involved E.W.'s ex-husband; threatened her son's future career; and escalated his torment by sending her a live python. The probable cause standard "is a fluid concept, turning on the assessment of probabilities in a particular factual context," and is a "practical, nontechnical one invoking the practical considerations of everyday life on which reasonable and prudent men [and women], not legal technicians, act." Ehnert , 160 Wis. 2d at 469. Considering all the information alleged in the search warrant affidavits and the deference shown to the circuit court, we conclude that the facts are more than sufficient to support a finding of probable cause. See Higginbotham , 162 Wis. 2d at 989. We uphold the circuit court's findings.
By the Court. -Judgment affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(f) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

B.K. was a coworker of E.W. who she was in a relationship with.

Burrows alleges in his brief-in-chief that "[a] digital extraction of Burrows' cellphone, however, ... reveal[ed] that no call was placed from his phone to the apartment complex on the date and time in question." The State explains that a record of the call was found after the State issued a subpoena for records from U.S. Cellular, which are more reliable as they cannot be altered by the user, and did show a call from Burrows' cell phone to the apartment complex at the same time and date on the caller identification.

The Transaction Information for Management of Enforcement (TIME) System is a "data communications function that serves all state and local law enforcement agencies in Wisconsin" and was implemented "to meet a basic need of all law enforcement agencies for the fast and efficient exchange of factual law enforcement information." Wisconsin Department of Justice, Time System Manual , https://wilenet.org/html/cib/manuals-forms/manuals/Time% 20System% 20Manual.pdf. "The nucleus of the TIME System is a computer-based data communications control center provided by the Wisconsin Crime Information Bureau (CIB).... CIB maintains a computerized central repository of information of a statewide significance on warrant/wanted and missing person, stolen vehicles, stolen/missing license plates and stolen vehicle parts." Id.

Burrows claims that the August 19, 2016 postmark date on this letter helps to exonerate him as he was still in jail at this time. The State explains, however, that the letter had an original postmark date of August 17, 2016, but had to be manually sorted due to a tear in the envelope, which resulted in the August 19, 2016 postmark.

The fact that a female voice was linked to Burrows' cell phone also connects Burrows to the letters written from a female perspective as well as the voicemails left by a female.

This is consistent with the case law across other jurisdictions as it is "common for a directive or request for action to be circulated within or between law enforcement agencies unaccompanied by any recitation of the underlying facts and circumstances." See 2 LaFave, Search and Seizure , § 3.5(b), at 335-36 (5th ed. 2012) (emphasis added). "It frequently occurs, therefore, that an officer will make an arrest simply in response to such a directive or request and without personal knowledge of what facts are believed to show that a crime has been committed by the person to be arrested." Id. at 336. "As for the nature of the requisite showing, dictum in some of the cases suggests that it is necessary to trace the action of the arresting officer back to some other specific person in the same or another law enforcement agency and show that the latter individual had brought together a sufficient collection of underlying facts to add up to probable cause. Other cases, again often by way of dictum, indicate that it will suffice that the directing or requesting agency possessed all the facts needed to show probable cause." Id. at 344. The case law suggests that there is a distinction between whether "there has been a directive or request from another officer or agency" or whether "there has been no such directive or request but the arresting or searching officer attempts to justify his action on the ground that other officers were in fact in possession of the underlying facts justifying his action." 2 LaFave, Search and Seizure , § 3.5(c) at 351.

Further, Burrows argues that his arrest was an extra-jurisdictional act. He claims that the Manitowoc County Sheriff's Department was merely the agency by which the principle, the Sheboygan police, effectuated the arrest of Burrows, and his arrest should be attributed to the Sheboygan police who did not have authority outside their jurisdiction to arrest Burrows. Burrows cites to State v. Slawek , 114 Wis. 2d 332, 335-36, 338 N.W.2d 120 (Ct. App. 1983), which he states stands for the proposition that "a police officer acting outside his or her jurisdiction does not act in his or her official capacity and does not have any official power to arrest."
The Sheboygan police did not arrest Burrows, and although they were there when Burrows was arrested, they enlisted the assistance of Manitowoc County who had jurisdiction to arrest Burrows. Burrows cites no authority for the proposition that it was unlawful for Manitowoc County to arrest him at the direction of the Sheboygan police, and as we already determined, the arrest was proper under the collective knowledge doctrine. See also 2 LaFave, Search and Seizure , § 3.5(b), at 341-42 & nn.47-51 (5th ed. 2012) (explaining that the collective knowledge idea has been applied through the country to "all modes of communication" as well as "within [a police] department, between different agencies or agencies at different levels within a state, between officials in different states, and also between federal and state or local authorities").

Burrows claims for the first time on appeal that Clark and Stewart did not have jurisdiction specifically to conduct the search incident to arrest. Accordingly, we conclude that Burrows' argument is deemed waived. See Wis. Stat. § 971.31(2). Even if Burrows had raised the objection below or if we elected to consider the error, see Madison v. State , 64 Wis. 2d 564, 573, 219 N.W.2d 259 (1974), on appeal he does not develop any substantive argument for this challenge, see State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).
To the extent we have not addressed an argument raised by Burrows on appeal, the argument is deemed rejected. State v. Waste Mgmt. of Wis., Inc. , 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978).

Burrows claims that it was a female making the telephone calls and sending the letters, so it cannot be said that Burrows caused E.W. distress. As we previously determined that there was probable cause to believe that Burrows was responsible for all these related events, we impute E.W.'s distress to Burrows.