COURT OF APPEALS

DECISION

DATED AND FILED

August 9, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP176-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2015CF417**

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CRISTIAN DANIEL NUNEZ,

DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for St. Croix County: SCOTT R. NEEDHAM, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Cristian Nunez appeals a judgment convicting him of several crimes, including two counts of first-degree intentional homicide and

one count of arson of a building. He also appeals orders denying him postconviction relief and awarding restitution. A jury found Nunez guilty of the charged crimes after the State established beyond a reasonable doubt that Nunez killed his ex-girlfriend, Courtney Bradford; killed Courtney's ten-year-old daughter, Jasmine; started Courtney's home on fire; and used Courtney's vehicle and debit card to flee to El Paso, Texas.

¶2      Nunez contends that his trial counsel provided ineffective assistance by not objecting to, or seeking the suppression or exclusion of, certain evidence introduced at trial. In addition, Nunez argues that the circuit court erroneously exercised its discretion by admitting into evidence his statements about "hat[ing]" Courtney and by admitting evidence of Jasmine's "sexual injuries." Finally, Nunez asserts that the court erroneously exercised its discretion by awarding restitution. We reject Nunez's arguments and affirm.

## BACKGROUND

¶3      On September 2, 2015, at around 12:30 p.m., police responded to a report of smoke coming from a home. Upon arriving, police spoke with Adam Norwig, Courtney's ex-fiancé, who informed them that Courtney owned the home, that Courtney had not answered Norwig's phone calls, and that Jasmine had not shown up for school that day. Police conducted a brief sweep of the home, noticing the smell of smoke and gasoline in the home, and observed that "there had been a fire of some sort, mostly in the basement."

¶4      Shortly thereafter, the fire department searched the home and discovered Courtney's body, which had been buried under a pile of clothes in the master bedroom. Courtney had a "substantial wound to the back of her head" that appeared to be from "blunt force trauma." Fire personnel then found Jasmine's

2

body in the basement underneath a pile of burnt blankets and clothing. A roll of duct tape and a five-gallon gasoline container were also found near Jasmine's body.

¶5 Upon further investigation, police learned that Nunez was possibly Courtney's then-boyfriend and had lived with her "on and off again." Police also learned that Courtney's vehicle, which had OnStar service, was missing. Police began searching for Nunez. They spoke with Nunez's employer, who eventually acknowledged that Nunez was an employee and that Nunez had asked the day before to have September 2 off from work so that Courtney could take him to get a passport. Nunez's employer also informed police that Nunez had been staying at a nearby hotel. Police went to that hotel and spoke to hotel staff, but they were unable to locate Nunez.

¶6 Police also contacted OnStar to locate Courtney's vehicle via GPS. After police obtained a court order permitting use of the vehicle's GPS, OnStar tracked Courtney's vehicle to an area near an airport in Des Moines, Iowa. Law enforcement in Des Moines later found Courtney's vehicle in a parking lot at Des Moines International Airport.

¶7 At some point before officials in Iowa found Courtney's vehicle but after police determined that Nunez could not be located, police submitted "an emergency order" to Nunez's cell phone provider, seeking to track the location of his cell phone. Police determined that there were exigent circumstances at that time "because there was a homicide that [had] occurred, and the public was in danger." Pursuant to the emergency order, police received information that Nunez's cell phone was located "in the area of O'Hare Airport in Chicago,

Illinois." Police also learned that Nunez's phone was used to call a hotel in El Paso, Texas.

¶8 Joseph Welsch, a special agent with the Wisconsin Department of Justice, then called the hotel in El Paso and spoke to an employee, Martha Singh. Singh informed Welsch that Nunez had not yet checked into the hotel but was scheduled to do so later that night. Welsch spoke to Singh by phone again at around 12:30 a.m. on September 3, 2015, and learned that Nunez had checked into his room. Welsch subsequently contacted El Paso law enforcement, who then arrested Nunez at around 6:30 a.m. that day.

¶9 Police also later obtained records detailing transactions on Courtney's debit card. Those records revealed that in the early morning of September 2, 2015, Nunez had purchased, and then later cancelled, a Greyhound Bus ticket in his name from Des Moines to El Paso. The records also showed that Nunez used Courtney's debit card on September 2 to reserve his hotel room in El Paso and to purchase his plane ticket from Des Moines to El Paso, with a layover at O'Hare International Airport.

¶10 On September 4, 2015, police searched Nunez's Wisconsin hotel room and the dumpster behind the hotel. In the dumpster, police found a clear plastic bag containing "hardly worn" camouflage tennis shoes that matched a description of the shoes Nunez typically wore. Police later determined that stains on those shoes contained traces of blood and Courtney's DNA. In addition, a small digital voice recorder was found tucked inside one of the shoes. That device contained nearly fifty hours of recordings, which included Courtney's voice, Matthew Kari's voice (a man who spoke to Courtney by telephone), and a man's voice speaking "broken English."

¶11     Doctor Michael McGee performed autopsies on both of the victims' bodies. McGee found that Courtney had been stabbed twenty-nine times near her neck, which caused extensive hemorrhaging and eventually led to her death. Similarly, Jasmine's cause of death was determined to be four stab wounds around her neck area. In addition, McGee noted other injuries on Jasmine's body, such as burns on her legs, "pinpoint hemorrhages" in her face, and "injuries to the external genitalia."

¶12     The State charged Nunez with two counts of first-degree intentional homicide and one count each of operating a motor vehicle without the owner's consent, unauthorized possession of an individual's personal identifying documents, and arson of a building. The case proceeded to trial, whereupon a jury found Nunez guilty of all counts. The circuit court subsequently sentenced Nunez to consecutive life sentences without eligibility for extended supervision on the first-degree intentional homicide counts, and it imposed other concurrent sentences on the remaining counts. The court also ordered Nunez to pay a total of $196,054.46 in restitution.

¶13     Nunez subsequently filed a postconviction motion seeking a new trial based on several claims of ineffective assistance of counsel and on allegedly erroneous evidentiary rulings. In particular, Nunez claimed that his trial attorneys were ineffective for not objecting to: (1) the restitution award; (2) evidence from the warrantless search of his cell phone location; (3) hearsay evidence; (4) testimony about Nunez's ability to speak English; (5) testimony regarding Jasmine's "sexual injuries"; and (6) testimony concerning the contents of the digital recording. Nunez also challenged the circuit court's decisions to permit testimony regarding his statements to others concerning Courtney and testimony regarding Jasmine's "sexual injuries."

¶14     The circuit court held a ***Machner***[1] hearing on Nunez's motion, at which Nunez's two trial attorneys and the prosecutor testified.  The State noted at the beginning of the hearing that it would not contest Nunez's ineffective assistance of counsel claim regarding restitution, and it agreed Nunez should receive a restitution hearing.  The court accepted the State's concession and scheduled a restitution hearing for a later date.  Following the hearing, the court issued a written decision denying all of Nunez's remaining postconviction claims.  The court also later awarded restitution in the same amount previously awarded, after a court commissioner held a hearing on the matter.

¶15     Nunez appeals, renewing his postconviction claims and challenging the new restitution order.  Additional facts will be noted as necessary below.

## DISCUSSION

### I.  Ineffective assistance of counsel

¶16     A criminal defendant has the constitutional right to effective assistance of counsel.  ***State v. Sholar***, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89.   To prevail on an ineffective assistance of counsel claim, the defendant bears the burden of proving: (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense.  ***Id.***   A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one.  ***State v. Smith***, 2003 WI App 234, ¶15, 268 Wis. 2d 138, 671 N.W.2d 854.

---

[1] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶17    A defendant can establish deficient performance by showing that his or her trial counsel's performance fell below "an objective standard of reasonableness." *State v. Savage*, 2020 WI 93, ¶28, 395 Wis. 2d 1, 951 N.W.2d 838 (citation omitted). "Courts afford great deference to trial counsel's conduct, presuming that it 'falls within the wide range of reasonable professional assistance.'" *Id.* (citation omitted). "An attorney does not perform deficiently by failing to make a losing argument." *State v. Jacobsen*, 2014 WI App 13, ¶49, 352 Wis. 2d 409, 842 N.W.2d 365 (2013).

¶18    To establish prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Savage*, 395 Wis. 2d 1, ¶32 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. However, "a defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *Sholar*, 381 Wis. 2d 560, ¶44 (citing *Strickland*, 466 U.S. at 693).

¶19    Whether a defendant has been denied the effective assistance of counsel is a mixed question of law and fact. *Savage*, 395 Wis. 2d 1, ¶25. We will not overturn a circuit court's findings of fact, including findings regarding the factual circumstances of the case and trial counsel's conduct and strategy, unless those findings are clearly erroneous. *Id.* We review de novo whether counsel performed deficiently and, if so, whether counsel's deficient performance was prejudicial to the defense. *Id.*

¶20 For the reasons explained below, none of Nunez's claims establish deficient performance because his trial attorneys were not required to advance losing arguments. *See Jacobsen*, 352 Wis. 2d 409, ¶49.

*A. Evidence obtained from the search of Nunez's cell phone location*

¶21 Nunez argues that his trial attorneys were ineffective for not seeking to suppress evidence obtained from the warrantless search of his cell phone location. Nunez contends that at the time police tracked his cell phone's location, exigent circumstances and probable cause required to conduct a warrantless search did not exist because police had no evidence connecting him to the homicides, except for his prior relationship with Courtney.

¶22 Under the exigent circumstances exception, a warrantless search does not violate a suspect's Fourth Amendment rights if: (1) the government can show that there is probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense or "evidence of a crime will be found"; and (2) there are exigent circumstances. *State v. Subdiaz-Osorio*, 2014 WI 87, ¶¶70-71, 357 Wis. 2d 41, 849 N.W.2d 748 (citation omitted). To establish probable cause for a search, the State must show that there is a "'fair probability' that contraband or evidence of a crime will be found in a particular place." *Id.*, ¶70 (citation omitted). In addition,

> [e]xigent circumstances exist if, "measured against the time needed to obtain a warrant," and under the facts known at the time, it was objectively reasonable for law enforcement to conduct a warrantless search when: (1) law enforcement was engaged in a "hot pursuit"; (2) there was a threat to the safety of either the suspect or someone else; (3) there was a risk of destruction of evidence; or (4) the suspect was likely to flee. The objective exigent circumstances test asks "whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life,

> risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape."

*Id.*, ¶73 (citation omitted).

¶23 Contrary to Nunez's argument,[2] the record supports a finding of probable cause and the existence of exigent circumstances, which would excuse any Fourth Amendment violation that might have occurred as a result of police tracking Nunez's cell phone location without a warrant. On September 2, 2015—the day the victims were found dead—police knew several critical facts, including that: (1) the victims had been murdered; (2) the fire was suspicious because of the smell of gasoline and the presence of the five-gallon gasoline container; (3) no murder weapon had been recovered from the scene; (4) Courtney's vehicle was missing from her residence; (5) Nunez was believed to be Courtney's boyfriend and had been living with her "on and off again"; (6) Nunez had told his employer the day before that he would not be at work on September 2 because Courtney would be taking him to get his passport; (7) Nunez was not in his hotel room; and (8) Nunez had not otherwise been located.

---

[2] We note that Nunez's argument is not supported by appropriate record citations, in violation of our Rules of Appellate Procedure. *See* WIS. STAT. RULE 809.19(1)(e) (2019-20). In particular, Nunez asserts—in conclusory fashion—that prior to obtaining his phone records, police had no evidence "connecting [him] to the homicides … and the fire." He asserts, again without any supporting record citation, that "[t]he only evidence the police had at this point was information that [he] and [Courtney] had been boyfriend and girlfriend at one time." Nunez has made no attempt to establish what police knew and when they knew it. This is a high-volume court, and we have no duty to scour the record to review arguments unaccompanied by adequate record citations. *See* ***Roy v. St. Lukes Med. Ctr.***, 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256. We admonish counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2) (2019-20).

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶24    Police could reasonably infer from these facts that Nunez and Courtney had a romantic relationship, albeit unsteady; that Nunez had planned to be, and likely was with, Courtney around the time of the homicides; that Nunez likely was in possession of Courtney's vehicle; and that he was actively fleeing and seeking to avoid detection. At the time police tracked Nunez's phone location, police had not yet found Courtney's vehicle, the weapon used to kill the victims, or Nunez. Thus, there was a "fair probability" that if Nunez had his phone, police would find him, the weapon used to commit the murders, and other evidence connecting him to the homicides. *See Subdiaz-Osorio*, 357 Wis. 2d 41, ¶¶70-71, 74.

¶25    These facts also support the existence of exigent circumstances and are similar to those in *Subdiaz-Osorio*. In that case, police tracked the defendant's cell phone location without a warrant after witnesses said that the defendant had fatally stabbed his brother and then borrowed his girlfriend's vehicle to possibly flee to Mexico. *Id.*, ¶¶3, 20, 22. At the time of the tracking, police had not found the defendant or any weapons at the scene of the crime, and police questioned whether the defendant was still armed. *Id.*, ¶24. Our supreme court concluded that "police arguably had their pick of three exigent circumstances. There was a threat to safety, risk of destruction of evidence, and a likelihood that [the defendant] would flee." *Id.*, ¶76.

¶26    The same three exigent circumstances at issue in *Subdiaz-Osorio* were present in this case. There was a threat of safety to either Nunez or someone else, a risk that evidence would be destroyed, and a likelihood that Nunez would flee. Based on the facts known at the time, police would have reasonably believed that there was a risk Nunez would attempt to destroy or dispose any or all of his clothes, the weapon used to commit the homicides, and Courtney's vehicle. Police

would also have reasonably believed that Nunez was a substantial threat to the safety of others because it appeared that he had killed both Courtney and Jasmine and then attempted to cover up their deaths by starting Courtney's home on fire, and it seemed possible that he still had the weapon used to stab the victims. Lastly, police would have reasonably believed that Nunez was attempting to flee because he was not in his hotel room, Courtney's vehicle was missing, he told his employer the day before that he would not be at work that day, and he could not otherwise be located.

¶27    Importantly, time was of the essence when police tracked Nunez's phone. Police were not sure when precisely the victims had been killed, but a canvas of the neighborhood on September 2, 2015, revealed that a neighbor had smelled smoke as early as 7:00 a.m. that day. Thus, Nunez would have had ample time to flee and begin disposing of evidence before police had even reached the crime scene at approximately 12:30 p.m. Under the facts known to police at the time, a reasonable police officer would reasonably believe that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of Nunez's escape. *See Subdiaz-Osorio*, 357 Wis. 2d 41, ¶73.

¶28    Nunez attempts to distinguish *Subdiaz-Osorio*, arguing that there were no eyewitnesses connecting him to the homicides and that there were no witnesses suggesting that he was fleeing to Mexico. Nunez's arguments are misplaced. Although the evidence in *Subdiaz-Osorio* might have been, as Nunez argues, "stronger and more direct," that fact does not negate its similarity to the facts and circumstances here and their support for the existence of probable cause and exigent circumstances. As we have noted, police in this case knew, among other things, that two victims had been killed, that Nunez lived with Courtney "on

11

and off again," that he told his employer he would be with Courtney on September 2 getting a passport and would not be at work that day, that Courtney's vehicle was missing, and that Nunez was nowhere to be found. As discussed earlier, the above gave law enforcement probable cause to believe that Nunez committed crimes and exigent circumstances existed to permit a warrantless search for him.

¶29 Nunez also contends that, irrespective of the foregoing, police should have sought a telephonic warrant before tracking his cell phone location, arguing, without any support, that "[t]here was more than enough time to apply for a warrant." We disagree with these notions. Police knew that Nunez likely had at least five hours—if not more—to flee, hide and dispose of evidence before police arrived at the scene. Thus, by the time police narrowed their focus to Nunez, they would have reasonably believed that any delay in procuring a warrant—even a telephonic warrant—would have gravely endangered life, risked the destruction of evidence, and, most prominently, increased the likelihood of Nunez's escape.

¶30 In addressing Nunez's postconviction motion, the circuit court recognized that if Nunez's trial counsel had filed a motion to suppress evidence obtained from police tracking his cellphone, "[the motion] would have been denied." The court concluded that Nunez's trial counsel had not performed deficiently. We agree with the court's analysis because the existence of probable cause and exigent circumstances would have provided a sufficient basis to deny the motion to suppress. Nunez's trial counsel therefore did not perform deficiently.

*B. Hearsay testimony at trial*

¶31 Nunez next argues that his trial attorneys were ineffective for not objecting to testimony regarding certain out-of-court statements that violated his Sixth Amendment right to confrontation and "the teaching of *Crawford v. Washington*, 541 U.S. 36 (2004)." In particular, Nunez takes issue with Investigator Shawn Demulling's testimony regarding: (1) an OnStar employee's statement that, based on GPS tracking, Courtney's vehicle was located near the airport in Des Moines; (2) an out-of-state police officer's statement that Courtney's vehicle had been located at the airport; and (3) a gym employee's statement that Courtney had attended a class the night of September 1, 2015. Nunez also takes issue with Singh, the hotel employee in El Paso, testifying about statements made to her over the phone by Agent Welsch and an unnamed woman.[3]

¶32 "Both the Sixth Amendment to the United States Constitution and the Wisconsin Constitution guarantee a criminal defendant the right to confront witnesses who testify against the defendant at trial." *State v. Mattox*, 2017 WI 9, ¶20, 373 Wis. 2d 122, 890 N.W.2d 256. Under *Crawford*, "a defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements *by someone who does not testify* at the trial if those statements are 'testimonial' and the defendant has not had 'a prior opportunity' to cross-examine the out-of-court declarant." *Mattox*, 373 Wis. 2d 122, ¶24 (emphasis added) (citing *Crawford*, 541 U.S. at 68). However, "the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth

---

[3] The unnamed woman who spoke to Singh on the telephone was later determined to be Maria Nunez, Nunez's cousin.

of the matter asserted.'" *See **State v. Hanson***, 2019 WI 63, ¶19, 387 Wis. 2d 233, 928 N.W.2d 607 (quoting ***Crawford***, 541 U.S. at 59 n.9).

¶33     Nunez's argument that Singh's testimony violated his right to confrontation is a nonstarter.   Singh's testimony included references to out-of-court statements made over the phone by Agent Welsch and Maria Nunez. Nunez fails to recognize, however, that both Welsch and Maria Nunez testified at trial regarding their conversations with Singh, and Nunez therefore had an opportunity to cross-examine them.   Accordingly, their out-of-court statements did not violate Nunez's confrontation right. *See **Mattox***, 373 Wis. 2d 122, ¶24.

¶34     Nunez's argument regarding Investigator Demulling's testimony is equally unavailing.   The gym employee, Jennifer Williams, testified at trial regarding her conversation with Demulling, and Nunez therefore had an opportunity to cross-examine her.   In addition, the out-of-court statements by the OnStar employee and by the police officer in Des Moines were not offered for the truth of the matter asserted—i.e., to prove the location of Courtney's vehicle. *See **Hanson***, 387 Wis. 2d 233, ¶19.   Rather, the record demonstrates that the State used Demulling's testimony to explain how police located Courtney's vehicle during the exigent circumstances of trying to locate a fleeing suspect in a double homicide.   Significantly, the State had no need to rely on any out-of-court statements regarding the location of Courtney's vehicle because Officer Kyle Thies testified at trial that he personally located Courtney's vehicle at Des Moines International Airport. *See **id.***, ¶25 ("When the State proffers a statement for a nonhearsay purpose, close attention should be paid to the relevancy of, and need for, this use of the evidence." (citation omitted)).   Thus, Demulling's testimony

14

simply explained how Thies learned to look for Courtney's vehicle at the airport.[4] For those reasons, Demulling's testimony did not violate Nunez's right to confrontation.

### C. Testimony regarding the contents of the digital recording

¶35     Nunez also argues that his trial attorneys were ineffective for not objecting to testimony regarding the contents of the digital recording.  He contends that the following testimony was irrelevant, speculative and unfairly prejudicial: (1) Investigator Demulling's testimony that the recording contained arguments, the sound of what seemed to be "people … having sex," the sound of a car door opening and closing, and the sound of a man speaking "broken English"; (2) Matthew Wiseman's testimony that the recording did not contain his voice; and (3) Matthew Kari's testimony that the recording contained a conversation between him and Courtney.[5]

¶36     The State argues—and we agree—that Nunez's argument is largely undeveloped.  Nunez fails to provide any analysis explaining how the testimony was irrelevant, speculative or unfairly prejudicial; he simply asserts those conclusions.  Nunez also did not respond to any of the State's counterarguments

---

[4] Even if we assumed that the State had offered the out-of-court statements to prove the location of Courtney's car and that Nunez's trial attorneys were deficient for not objecting to those statements, Nunez cannot establish a reasonable probability that, but for trial counsel's failure to object to these statements, the outcome of the proceedings would have been different. *See* **State v. Savage**, 2020 WI 93, ¶32, 395 Wis. 2d 1, 951 N.W.2d 838.  Again, the location of Courtney's vehicle was independently established by Officer Thies's testimony.

[5] Nunez also criticizes testimony that characterized one of the voices on the recording as a person of "Latino descent."  However, the circuit court sustained trial counsel's immediate objection and instructed the jury to disregard that testimony.  Thus, Nunez cannot show either deficient performance or prejudice as a result of that testimony.

regarding this issue. Accordingly, we need not consider his argument. *See **State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not address undeveloped arguments); ***United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession).

¶37 Regardless, the testimony was relevant to connecting Nunez to the digital recorder and to the pair of shoes in which the recorder was found. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. The State argued at trial that Nunez committed the crimes because Courtney was seeing other men. Thus, testimony establishing that the recording contained a conversation between Courtney and another man, as well as the voice of a man speaking "broken English" was relevant to show that Nunez was likely aware of the recording and was aware of Courtney speaking to other men. The testimony connecting Nunez to the recording also further increased the likelihood that Nunez wore the shoes in which the digital recorder was found. Significantly, the State presented evidence that blood and Courtney's DNA were found on those shoes.

¶38 In addition, none of the testimony is speculative or unfairly prejudicial. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03. Here, the witnesses' testimony appears to be rationally based on their perception when they listened to the recording. *See* WIS. STAT. § 907.01; *see also* WIS. STAT. § 909.015(5). Although nearly all evidence is prejudicial to the party against

16

whom it is offered, *see* **State v. Murphy**, 188 Wis. 2d 508, 521, 524 N.W.2d 924 (Ct. App. 1994), we cannot discern any unfair prejudice from the witnesses' testimony here.

### D. Evidence regarding Nunez's ability to speak English

¶39 Nunez next argues that his trial attorneys were ineffective for not objecting to testimony regarding his ability to speak English. He contends the State introduced that evidence for no reason other than to "potentially capitalize on negative sentiments toward Mexican[s] or people of Hispanic descent." Nunez further asserts that "[t]he unfairly prejudicial effect of such questioning outweighed any probative value."

¶40 In response, the State argues that it introduced evidence of Nunez's ability to speak English to debunk any misconception that Nunez could not speak English. The State points out that Nunez had two court-appointed interpreters assisting him at trial and that the circuit court, at Nunez's request, explained the roles of the interpreters to the jury. The State contends that Nunez's ability to speak English was therefore relevant to proving that Nunez had sent text messages in English confronting Courtney about seeing other men and that Nunez had spoken in "broken English" captured on the digital recorder.

¶41 The State's questions and evidence at issue can be summed up as follows. The State asked witnesses questions regarding Nunez's ability to speak English, including: (1) "Did he have any difficulty understanding English …?"; (2) "Did he ever speak to you in Spanish?"; and (3) "[W]hat language were [Nunez's texts] in?" In addition, Investigator Demulling testified that he heard a man's voice on the digital recording speaking "broken English."

17

¶42 All of the State's questions were relevant to its case. The State introduced numerous text messages wherein Nunez accused Courtney—in English—of seeing other men. Thus, testimony regarding Nunez's ability to speak English was probative of proving that Nunez had sent those text messages, which, in turn, explained Nunez's potential motive for committing the homicides. The State also introduced evidence of a digital recording that purportedly contained Courtney's voice, the voice of another man, and the voice of a man speaking "broken English." That recording, as the State argued in closing arguments, was probative of Courtney's interactions with other men and Nunez's potential motive for committing the homicides, and the presence of a person speaking "broken English" tended to increase the likelihood that Nunez was connected to and aware of that recording.

¶43 Additionally, the State's questions had little—if any—unfair prejudicial effect. The questions were directly related to whether Nunez spoke English, and none of them involved racial stereotypes, carried negative racial connotations, or suggested racial bias. Moreover, as the circuit court aptly observed, Nunez has not identified any evidence suggesting the State made "a gratuitous effort to inject race into the trial."[6]

---

[6] Nunez also argues that the State's sentencing argument contained improper racial references and that "the [presentence investigation report (PSI)] contained blatant racial stereotyping." Notably, however, Nunez fails to explain or identify which part of the State's sentencing argument or the PSI contained the alleged improper references to race. His arguments are therefore conclusory and undeveloped.

Even if we assumed that the State's sentencing argument and the PSI did contain improper racial references and that trial counsel should have objected to them, Nunez has made no attempt to show that the circuit court improperly relied on those references or stereotypes at sentencing. Accordingly, Nunez has not established prejudice. That is, he has not shown a reasonable probability that, but for trial counsel's failure to object to the State's sentencing argument or the PSI, his sentence would have been different. *See Savage*, 395 Wis. 2d 1, ¶32.

*E. References to Jasmine's potential "sexual injuries"*

¶44    Finally, Nunez argues that his trial attorneys were ineffective for not filing a motion in limine to exclude references to possible "sexual injuries" to Jasmine.  In particular, Nunez contends that the following references should not have been permitted at trial:  (1) the State's comment in its opening statement that "[Dr. McGee] sees evidence of possible injury in [Jasmine's] vaginal area that would have not been expected"; (2) McGee's testimony that "[t]here was abraded tissue to [Jasmine's] posterior labial, to the posterior commissure, and injuries surrounding the vaginal opening and just on the inside of the vaginal opening"; (3) testimony noting the existence of a "sexual assault kit for Cristian Nunez"; (4) testimony regarding oral, anal and vaginal swabs collected from Jasmine; and (5) testimony about penile swabs and pubic hair collected from Nunez.  Nunez contends that these references were irrelevant and unfairly prejudicial because he "was not charged with sexual assault."  He also argues that because his trial counsel did not file a motion in limine, the circuit court could not engage in the necessary other-acts evidence analysis under *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998).

¶45    As an initial matter, the State never introduced evidence that Jasmine had suffered "sexual injuries."  Rather, Dr. McGee testified that Jasmine's body had several different injuries, including "injuries to the external genitalia." McGee never testified that Jasmine's injuries were consistent with sexual assault, nor did he refer to them as "sexual injuries."

¶46    In any event, the testimony discussing Jasmine's injuries and the collection of forensic evidence was relevant.  As the prosecutor explained at the *Machner* hearing, the State needed "to show that [Jasmine] had a variety of

19

injuries" that "likely occurred prior to the fire," and it needed to rebut Nunez's defense of "an incomplete investigation." Indeed, the State needed to prove—beyond a reasonable doubt—that Nunez had been the individual who killed the victims and started the fire, *see* WIS. STAT. §§ 940.01(1)(a) and 943.02(1)(a), and to rebut Nunez's contention in his opening argument that "[t]here's a ton of pieces that are missing [from the State's case]." The fact that the State had discovered Jasmine's numerous injuries, including both the stab wounds and the vaginal injuries, demonstrated that the State had fully investigated what might have happened to Jasmine before and after her death and that the State considered all of the possible sources of Jasmine's injuries. Ultimately, Dr. McGee opined that the stab wounds, and not Jasmine's other injuries, were the cause of her death. In addition, testimony discussing the collection of all forensic evidence was necessary to show that the State had conducted a complete investigation and to demonstrate the absence of any forensic evidence indicating that another person committed the crimes.

¶47    Furthermore, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. Again, none of the witnesses testified that Jasmine's injuries were consistent with sexual assault. The testimony also arose in a germane context—i.e., testimony regarding Jasmine's vaginal injuries came about in a broader discussion of Jasmine's other injuries and testimony detailing the collection of forensic evidence from intimate body parts was discussed with other forensic evidence collected. To the extent the jury might have suspected that Nunez had been investigated for sexual assault, the jury nonetheless knew that Nunez had not been charged with such an offense and that the State was not arguing any sexual misconduct had occurred.

20

¶48 Finally, even if testimony regarding Jasmine's vaginal injuries and the collection of forensic evidence could be considered other-acts evidence under WIS. STAT. § 904.04(2), as Nunez suggests, the circuit court would not have erroneously exercised its discretion by admitting that testimony. The first step in the other-acts analysis is to determine whether the other-acts evidence is offered for a permissible purpose under § 904.04(2). *Sullivan*, 216 Wis. 2d at 783. As alluded to earlier, evidence of the State's investigation into Jasmine's multiple injuries and its collection of forensic evidence was necessary for the permissible purpose of proving identity beyond a reasonable doubt—i.e., that Nunez, and not someone else, committed the homicides. *See* § 904.04(2)(a). Although the vaginal injuries and the forensic evidence with which Nunez takes issue do not directly connect him to the crimes, the evidence demonstrated that the State thoroughly inspected Jasmine's body and examined all the available forensic evidence and that no evidence suggested a third-party actor had committed the crimes. This evidence also satisfies the final two steps of the other-acts analysis because, as we already discussed, the evidence is relevant and its probative value is not substantially outweighed by its prejudicial effect. *See Sullivan*, 216 Wis. 2d at 785, 789. Accordingly, any motion in limine seeking to exclude this testimony as other-acts evidence, as irrelevant, or as unfairly prejudicial would have been meritless.[7]

---

[7] We also note that Nunez's trial counsel did, in fact, object to the introduction of evidence that Jasmine had suffered vaginal injuries. The circuit court explained the objection and its decision regarding the objection, stating on the record:

> There was discussion in chambers relative to the injuries described by Dr. McGee regarding the vaginal area. The objection, I believe, was primarily because it could be prejudicial, and there's no claim to a sexual assault.

(continued)

21

## II. Evidentiary issues

¶49　We review a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard. *State v. Nieves*, 2017 WI 69, ¶16, 376 Wis. 2d 300, 897 N.W.2d 363. We will uphold a court's evidentiary ruling if the court "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process and reached a conclusion that a reasonable judge could reach." *State v. Marinez*, 2011 WI 12, ¶17, 331 Wis. 2d 568, 797 N.W.2d 399 (citation omitted).

### A. Other-acts evidence

¶50　Nunez argues the circuit court erroneously admitted other-acts evidence, over trial counsel's objections, by permitting witnesses to testify that Nunez "would call [Courtney] a bitch," said he "[h]ated her," and said he wanted "payback" and "[r]evenge" for her relationships with other men. He further argues that this testimony was irrelevant and unfairly prejudicial.

¶51　In response, the State correctly recognizes that Nunez's argument in his brief-in-chief is undeveloped because he "fails to explain why the [circuit] court erred in concluding that the statements did not qualify as other acts" and "fails to explain how he was prejudiced by the statements." Regarding the merits

---

The Court overruled the objection, indicating that they were part of the autopsy examination. They were part of the injuries that Dr. McGee found when he did the autopsy, and it's simply a matter of weight, if any, that the jury gives that.

Nunez fails to explain how the court's decision would have been any different had his trial counsel made the objection in a motion in limine, and he therefore has failed to show that his defense was prejudiced by counsel not filing such a motion.

22

of Nunez's argument, the State contends that the court properly determined Nunez's statements did not constitute other-acts evidence because they were not bad acts.

¶52    WISCONSIN STAT. § 904.04(2)(a) states:

> Except as provided in par. (b)2., evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Under certain circumstances, verbal statements might constitute other-acts evidence under § 904.04(2). *See State v. Jeske*, 197 Wis. 2d 905, 913-14, 541 N.W.2d 225 (Ct. App. 1995). However, "simply because an act can be factually classified as 'different'—in time, place and, perhaps, manner than the act complained of—that different act is not necessarily 'other acts' evidence in the eyes of the law." *State v. Bauer*, 2000 WI App 206, ¶7 n.2, 238 Wis. 2d 687, 617 N.W.2d 902; *see also State v. Moore*, No. 2009AP3167-CR, unpublished slip op. ¶19 (WI App Dec. 15, 2010) (concluding evidence of the defendant's visits to a gentlemen's club were not "other acts" evidence because "it was not used to show a similarity between those acts and the [homicide] crime [the defendant] was accused of committing").[8] "When the State or the defense offers a 'different' act to show a similarity between that other act and the act complained of, then it is properly termed 'other[-]acts evidence' and the court should proceed pursuant to WIS. STAT. § 904.04(2)." *Bauer*, 238 Wis. 2d 687, ¶7 n.2.

---

[8] An unpublished opinion issued on or after July 1, 2009, that is authored by a member of a three-judge panel may be cited for its persuasive value. WIS. STAT. RULE 809.23(3)(b).

¶53    The circuit court concluded that Nunez's "references to the victim and names that he may have called her [are not] other acts under the statute or under the analysis." We agree. Nunez's statements—that Courtney was a "bitch," that he "[h]ated her," and that he wanted "payback" and "[r]evenge"—are not other-acts evidence under the circumstances here. Nunez's statements were not introduced to show a similarity between the act of making those statements and the acts charged in the criminal complaint—i.e., the statements are not acts similar to the acts involved in first-degree intentional homicide, arson of a building, driving a vehicle without the owner's consent, and unauthorized possession of an individual's personal identifying documents. *See id.* Accordingly, the act of making those statements—in the context of this case—is not other-acts evidence under WIS. STAT. § 904.04(2)(a).

¶54    Nunez attempts to further develop his argument in his reply brief, arguing that his statements constitute the crime of disorderly conduct under WIS. STAT. § 947.01 because his statements "are obscene and provoked a disturbance." Nunez's efforts are unavailing. We need not address this argument because not only did Nunez fail to make the argument in his brief-in-chief, but he also failed to make the argument to the circuit court. *See **A.O. Smith Corp. v. Allstate Ins. Cos.**,* 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (we need not address an issue raised for the first time in a reply brief); ***State v. Rogers***, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995) ("We will not … blindside trial courts with reversals based on theories which did not originate in their forum."). Even so, Nunez has failed to show that his statements were made "under circumstances in which the conduct tends to cause or provoke a disturbance." *See* § 947.01.

24

¶55    In addition, Nunez's statements were highly probative to the charges of first-degree intentional homicide and were not unfairly prejudicial.  The fact that Nunez said he "[h]ated" Courtney and wanted "payback" and "[r]evenge" makes the fact that Nunez intentionally caused Courtney's death more probable and explains Nunez's potential motive for committing the crimes.  Nunez's statements also would not have a tendency to enflame a jury such that the jury would base its decision on something other than the established propositions in this case.

¶56    In sum, Nunez's statements do not constitute "other acts" under WIS. STAT. § 904.04(2)(a); they are relevant to the crimes charged; and any unfair prejudice does not substantially outweigh the probative value of the statements. Thus, the circuit court did not erroneously exercise its discretion by admitting evidence of Nunez's statements regarding Courtney.

*B. Evidence of Jasmine's injuries*

¶57    Nunez next argues that the circuit court "erred by allowing irrelevant testimony about [Jasmine's] sexual injuries."  As in his related ineffective assistance of counsel claim, Nunez contends that testimony about Jasmine's vaginal injuries and testimony about the collection of forensic evidence from intimate body parts was irrelevant, unfairly prejudicial, and constituted impermissible other-acts evidence of sexual assault.

¶58    For the same reasons we discussed above regarding Nunez's related ineffective assistance of counsel claim, we disagree.  No witnesses testified that Jasmine's injuries were consistent with sexual assault or that they were sexual in nature.  The testimony was offered for the permissible purposes of proving identity under WIS. STAT. § 904.04(2)(a), it was relevant, and its probative value

was not substantially outweighed by any danger of unfair prejudice. Thus, the circuit court did not erroneously exercise its discretion by permitting this testimony.

## III. Restitution

¶59 Nunez argues that the circuit court erred in several respects by awarding restitution. Nunez first contends that the court, in general, "failed to take into account [his] indigency," in violation of WIS. STAT. § 973.20(13)(a)2. Nunez points out that he had no financial resources to pay restitution and that, given his life sentences, he had no present or future earning capacity. Nunez also argues that the court's restitution award of $193,323.32 to Courtney's insurer, AAA, constitutes punishment, and it is therefore improper. Finally, citing *State v. Ortiz*, 2001 WI App 215, 247 Wis. 2d 836, 634 N.W.2d 860, Nunez asserts that the court unlawfully awarded costs of $1,800 to the St. Croix County Sheriff's Department because those expenses were incurred in the ordinary course of investigating and apprehending Nunez.

¶60 We review a circuit court's restitution order for an erroneous exercise of discretion. *State v. Muth*, 2020 WI 65, ¶14, 392 Wis. 2d 578, 945 N.W.2d 645. In determining whether to order restitution and the amount thereof, a court must consider, among other factors, the financial resources of the defendant. WIS. STAT. § 973.20(13)(a)2. Whether the circuit court has authority to order restitution pursuant to § 973.20 under a certain set of facts is a question of law that we review de novo. *State v. Lee*, 2008 WI App 185, ¶7, 314 Wis. 2d 764, 762 N.W.2d 431.

¶61 Contrary to Nunez's arguments, the court commissioner and the circuit court—by adopting the court commissioner's decision—considered

Nunez's financial resources in determining restitution. The court commissioner recognized: "In terms of Nunez' ability to pay such an award, he is serving a lifetime sentence in prison and obviously has minimal assets. Nevertheless, a nominal amount should be [taken from any earnings or gifts that he receives] and is consistent with the sentencing rationale expressed by the Court at the sentencing hearing …." The court, in turn, ordered Nunez to pay twenty-five percent of his prison wages and any other earnings or gifts toward restitution. Despite Nunez's minimal assets and lack of future earning capacity, the court could reasonably conclude that Nunez could afford to pay twenty-five percent of his future prison wages, earnings and gifts toward the restitution sum. Therefore, the court did not erroneously exercise its discretion.

¶62    The circuit court also did not erroneously exercise its discretion by awarding restitution to AAA in the amount of $193,323.32. A court may—"[i]f justice so requires"—order a defendant to reimburse an insurer who has compensated a victim for a loss otherwise compensable under WIS. STAT. § 973.20. *See* § 973.20(5)(d). Here, the State presented evidence that AAA paid $193,323.32 to cover Courtney's home and property damage that occurred as a result of Nunez's crimes. After acknowledging the correct legal standard under § 973.20(5)(d), the court commissioner concluded that it could not "think of another case where the term 'justice so requires' rings truer and thus requires an award to AAA under these facts. The horrific crimes committed by Nunez speak for themselves, and a lifetime payment plan to AAA from Nunez's prison wages is warranted in this case." In doing so, the court commissioner also recognized that the victims' family did not seek restitution because recurring nominal payments "would likely only add insult to the [family's] injuries." Although Nunez summarily contends that the restitution award to AAA was designed to punish, he

does not dispute that AAA had to pay $193,323.32 to cover damages to Courtney's home and property as a result of his crimes. The court therefore reached a reasonable conclusion that justice required Nunez to reimburse AAA for the insurance payment.

¶63 Finally, we reject Nunez's argument that the circuit court erred by awarding costs of $1,800 to the St. Croix County Sheriff's Department. WISCONSIN STAT. § 973.06(1)(a) authorizes costs and fees taxable against a defendant for "[t]he necessary disbursements and fees of officers allowed by law and incurred in connection with the arrest, preliminary examination and trial of the defendant, including, in the discretion of the court, *the fees and disbursements of the agent appointed to return a defendant from another state or country*." (Emphasis added.) On appeal, it is undisputed that the St. Croix County Sheriff's Department paid an agency $1,800 to transport Nunez back to Wisconsin from Texas. Thus, that fee could be imposed as costs pursuant to § 973.06(1)(a). In addition, Nunez's reliance on *Ortiz* is inapt because that case involved restitution, not the statutory costs that Nunez concedes were imposed upon him here.[9] *See Ortiz*, 247 Wis. 2d 836, ¶22.

---

[9] Nunez concedes throughout his briefing that the circuit court "ordered *costs* in the amount of $1,800.00 to the St. Croix County Sheriff's Department." (Emphasis added.) He makes no argument, however, regarding whether this sum was actually *restitution* or whether it could be awarded as restitution. We will not abandon our neutrality to develop Nunez's arguments for him, and we therefore do not address the issue further. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

*By the Court.*—Judgment and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.